HOLT v. CALIFORNIA DEVELOPMENT CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 10, 1908.)

No. 1,484.

**1. Corporations—Suit by Stockholder—Sufficiency of Bill.**

A bill by a stockholder against the corporation and a railroad company alleged that a contract was entered into between the two companies by which the railroad company agreed to lend to the other a large sum of money, taking as security a pledge of a majority of the latter's stock, with power to vote the same on default in repayment of any installment of the loan, and an agreement by which it was to name the president and general manager and three of the seven directors of the borrowing company, and which provided that the other directors should not be objectionable to it; that large sums were advanced by the railroad company which were in fact expended for its own benefit, but ostensibly for the benefit of the other company to which they were charged; that by reason of the latter's control by the railroad company so secured it was wholly unable to extricate itself from its indebtedness, and would be absorbed by the railroad company, as was the fraudulent intention when the contract was made; and that the other stockholders would be deprived of their property. The bill prayed for a cancellation of the contract; that an accounting be had in respect to the advances made and the equities of the parties determined. *Held*, that such bill was for the benefit of the corporation of which complainant was a stockholder, and that under its allegations he was not required to tender repayment of the sums advanced by the railroad company.

**2. Same—Contracts—Ultra Vires—Contract.**

Section 12 of the New Jersey Corporation Act (P. L. 1896, p. 281), in force in 1896, provides that the business of every corporation shall be managed by its directors who shall be stockholders, and shall be chosen annually by the stockholders, and section 13 provides that every corporation shall have a president, secretary, and treasurer who shall be chosen either by the directors or stockholders as the by-laws direct. *Held*, that a contract made by a corporation organized under such act, by which it agreed to cause three of its seven directors to resign; that their successors should be named by another corporation, and one of such members should be elected president and general manager; that the other directors should be not objectionable to such other corporation; and that such officers and directors should remain in office until a loan should be repaid to the other corporation which did not all become due for six years—was in violation of such provisions of the statute and ultra vires and void, and was not validated by the fact that it contained a further provision by which the outside corporation acquired the right to vote a majority of the stock of the New Jersey corporation.

**3. Same—Surrender of Control to Another Corporation.**

The purpose of a grant of corporate power is that the corporation shall exercise its powers and carry on its business through its own officers and agents, and an agreement by which it surrenders the management and control of its affairs and business to another corporation organized for a wholly different purpose and carrying on a different business is ultra vires.

**4. Same—Suit by Stockholder for Cancellation of Ultra Vires Contract —Estoppel.**

A contract made by a corporation which is ultra vires in the true sense is void, and neither the corporation nor a stockholder is estopped to attack its validity by the fact that the corporation or the other party has acted under it, nor by delay in bringing suit for its cancellation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 1556–1564.]

Ross, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern Division of the Southern District of California.

Walter Malins Rose· and Hunsacker & Britt, for ·appellant.

J. S. Chapman, E. A. Meserve, E. S. Ives, and J. W. McKinley, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. This suit was commenced in the Circuit Court of the United States for the Southern Division of the Southern District of California. The plaintiff is a citizen of the state of California residing in the city of Los Angeles in the Southern Division of the Southern Judicial District. The defendant the California Development Company is a corporation organized and acting under the laws of New Jersey, having an authorized capital of $1,250,000 divided into 12,500 shares of the par value of $100 each. Its principal offices are in the city·of Los Angeles, with property and business situate largely in San Diego county. The defendant the Southern Pacific Company is a corporation organized and acting under the laws of Kentucky,· and operating a line of railroad extending through the Southern Division of the Southern Judicial District of California, with executive and administrative offices in the city of Los Angeles. The plaintiff is, and ever since the 1st day of November, 1900, has been, the owner and holder of 170 shares of the capital stock of the defendant the California Development Company. The defendant the California Development Company is the owner of all the capital stock of the corporation known as "La Sociedad de Yrrigacion y Terrenos de la Baja California (Sociedada Anonima)," which is referred to in the bill of complaint as the "Mexican Company."

In an amended bill of complaint filed February 12, 1906, the plaintiff seeks to obtain a decree against the defendants, the California Development Company and the Southern Pacific Company, declaring a certain contract entered into between the defendants on June. 20, 1905, ultra vires, invalid, and not binding upon the defendant the California Development Company, arid that the same be surrendered up and canceled; that a receiver be appointed to take possession of the assets and business of the California Development Company; that the defendant the Southern Pacific Company, its agents, servants, and employés be enjoined, during the pendency of the suit, from enforcing or attempting to enforce any of the terms of the instruments set forth in the complaint, or making new or different contracts relating thereto, or making other or further advances to the defendant the California Development Company under and by virtue of said contracts, and that the defendant the Southern Pacific Company be required to account for all advances theretofore made to the defendant the California Development Company. Plaintiff alleges that the principal object which the organizers and promoters of the organization of the defendant the California Development Company had in view in the formation of said corporation was to acquire the right to divert and apply to beneficial uses water flowing in the Colorado river at a point, in San Diego county, Cal., near the international boundary line be-

tween the United States and the Republic of Mexico, and to convey the same for irrigation and other beneficial uses by means of an intake, heading, canals, and ditches from said river to certain arable lands lying in said San Diego county near said international boundary, and in that portion of Lower California in the Republic of Mexico adjoining said boundary upon the south; that a very large body of arable land in said vicinity, comprising upwards of 100,000 acres in said Lower California, and upwards of 800,000 acres in said San Diego county, was and is capable of irrigation from said Colorado river at reasonable outlay, by reason of the fact that said lands are lower than the bed of said river at or near said point and that said lands are in large part below the level of the sea.

From this and other allegations contained in the amended bill of complaint it appears that the lands referred to are located in the desert region between the Colorado river and the Salton Basin below the level of the sea in San Diego county, Cal., and in the adjoining territory of a similar character on the south in Lower California in the Republic of Mexico. Plaintiff alleges that in the month of May, 1900, in pursuance of the purpose set forth in the bill, the California Development Company acquired by appropriation under the laws of the state of California the right to 500,000 miner's inches of the water of the Colorado river, and thereafter, by the expenditure of large sums of money, the California Development Company constructed a heading and intake for the diversion of said water, and about 70 miles of canals and ditches, whereby said water was diverted and conveyed to and became available for the irrigation of about 500,000 acres of the lands described; that prior to the application of water to these lands they were part of an arid and desolate desert, wholly unproductive and valueless; that the enterprise of reclaiming these lands from the desert was undertaken and carried out by the California Development Company prior to the act of Congress of June 17, 1902, c. 1093, 32 Stat. 388 (U. S. Comp. St. Supp. 1907, p. 511), authorizing the expenditure of public moneys in aid of the irrigation of arid lands, and was of vast magnitude and created many million dollars' worth of wealth where none had existed before, and has been, and is, of great public benefit and advantage; that said water right is a prior right upon the waters of the Colorado river and of very great value, plaintiff being informed and believing that it is reasonably worth the sum of $1,500,000; that in furtherance of the purpose of the California Development Company to acquire the right to divert and apply to beneficial uses 500,000 miner's inches of the water flowing in the Colorado river, the company, on or about July 1, 1900, executed a deed of trust conveying all of its property to a trustee to secure a bond issue to the amount of $500,000, and the company thereafter issued and sold its bonds and used the proceeds thereof in and about its said business and in furtherance of its purposes as aforesaid; that the principal security for said bonds is the water right of the California Development Company and the heading, intake, and canals of the company, all of which are covered by and included in the deed of trust whereby said bonds are secured. Plaintiff further alleges that in the spring and summer of 1901, by reason of the incompetency of

one C. R. Rockwood, the engineer of the California Development Company, silt was allowed to accumulate in the intake for said water in that portion of the canal adjacent thereto, whereby it was difficult to divert the needed water from the Colorado river into the canals of the California Development Company; that thereafter, and in the month of September, 1904, the Mexican Company caused a cut to be made in the bank of the Colorado river and in the Republic of Mexico, and at a place where the bed of the river was much higher than the Mexican Company's canal; that the soil was loose and unstable at that point, and the river gradually widened making a breach in its bank at that point until it became impossible to control or manage the flow of the river; that the intake gradually became the bed of the entire Colorado river along and upon which the entire waters of the river flowed; that the lands irrigated by the water so appropriated and diverted by the California Development Company are all below sea level, and much lower than the bed of the Colorado river from which the water is taken; that further westward is a vast area or basin known as the Salton Basin, into which the water from the Colorado river has been caused to flow through the new cut in the bank of the river, and that this water covers about 400 square miles of this basin and is continually rising therein.

Plaintiff further alleges that the Southern Pacific Company operates a line of railroad through and across said Salton Basin, which line at some points is more than 200 feet below sea level; that some time in the month of February or March, 1905, the inflow of water from the Colorado river to said Salton Basin began to approach and threaten to submerge the railroad tracks of the Southern Pacific Company at different points in the Salton Basin; that about that time the Southern Pacific Company realized that a continuance of the inflow of the Colorado river into the Salton Basin would compel it to remove the line of tracks to higher ground, which would involve great expense to it; that thereupon the Southern Pacific Company conceived the purpose of acquiring control of the California Development Company upon the pretext of being interested in aiding said company in its colonization and development work, but in reality for the purpose of making large expenditures to protect its right of way and tracks in the name of and as an indebtedness against the California Development Company, and of saddling a large amount of indebtedness therefor upon said company in the form of loans from the Southern Pacific Company; that at the time the Southern Pacific Company conceived the purpose of gaining control of the California Development Company as aforesaid, that company was in financial straits and its credit greatly impaired; that by reason of such financial difficulties said company was constrained by its necessitous condition to accept a loan of $200,000 offered by said Southern Pacific Company in the month of May, 1905; that by the terms of said loan the California Development Company agreed to give the Southern Pacific Company control of its board of directors and of all its officers until such time as it should repay said loan with interest. In addition and at the same time the Southern Pacific Company secured by way of pledge 6,300 shares of the capital stock of the California Development Company,

such number of shares being a majority of the 12,500 shares of the capital stock of that corporation; that said agreement was so worded and drawn that it became forthwith hopelessly impossible for the California Development Company ever to extricate itself from the terms thereof; and the Southern Pacific Company thereupon became a creditor in possession with complete dominion and control over the assets of the California Development Company. The agreement, as set out in the amended bill of complaint is dated the 20th day of June, 1905, and contains the following, among other, provisions: It recites that the California Development Company is desirous of borrowing from the Southern Pacific Company the sum of $200,000 to be used by it in paying off 'certain of its floating indebtedness, and in completing and perfecting its canal system and that of the Mexican Company; that the Southern Pacific Company is to loan and advance to the California Development Company and at once pay into its treasury the sum of $200,000 which said loan is to be repaid by the California Development Company to the Southern Pacific Company on or before March 1, 1911, in installments as follows: $20,000 on or before March 1, 1907; $30,000 on or before March 1, 1908; $40,000 on or before March 1, 1909; $50,000 on or before March 1, 1910; $60,000 on or before March 1, 1911—all deferred payments to bear interest from date of advancement and payment of the money to the California Development Company until paid, at the rate of 6 per cent. per annum, payable semiannually. To secure this loan and the repayment thereof with interest as provided the California Development Company agrees to procure certain of its stockholders to pledge 6,300 shares of its capital stock; said stock to be deposited in pledge for such purpose with a trustee to be selected by the Southern Pacific Company, and not to be transferred on the books of the corporation during the life of the pledge unforeclosed, but to remain in the names of the owners thereof, who shall have the right to sell and transfer their respective interests in the same, subject always to said pledge and the purpose thereof; at the time of so depositing said stock in pledge the respective owners thereof shall execute to the trustee or pledgee, as selected by the Southern Pacific Company, irrevocable powers of attorney or proxies, giving to said trustee the right to vote said stock at all meetings of stockholders of the California Development Company held after 90 days' default in payment of any installment of said loan or in performance of any other of the agreements of the California Development Company therein contained, and while such default continues.

It is also provided in the agreement that to secure the loan and the repayment of the same, and to secure the Southern Pacific Company in making the same, it is agreed that during the continuance of the whole or any part of said loan unpaid the Southern Pacific Company is to have three members on the board of directors of the California Development Company, one of whom shall be, during said term, the duly elected president and general manager of the company and its business; to that end the California Development Company agrees to cause three members of its board of directors as then constituted to resign, and in their places and steads to cause to be elected three par-

ties to be selected for that purpose by the Southern Pacific Company, upon which being done the California Development Company is to cause the other members on its board of directors then in California to vote for and elect one of the three directors so selected and named by the Southern Pacific Company to the office of president and general manager of the California Development Company and its business. And in the event of any vacancy occurring in the office of director held by either of said persons elected by the Southern Pacific Company or in said office of president, then the California Development Company shall cause such person to be elected to said office as the Southern Pacific Company shall designate. Provided that such president shall be acceptable—that is, not objectionable—to at least two members of the board other than those named by the Southern Pacific Company. It is further provided that in addition to having the right of nominating three members of said board of directors as in the agreement provided for, all members of said board shall be acceptable—that is, not objectionable—to the Southern Pacific Company; that the president and general manager so selected shall have the power to name the California Development Company's secretary, treasurer, attorney, superintendents, chief engineer, and consulting engineer; the parties so named, however, to be acceptable to at least two members of the board of directors other than those named by the Southern Pacific Company. It is further provided in the agreement that the California Development Company, being the owner of nearly all of the stock of the Mexican Company, it will cause the board of directors of said Mexican Company to be composed of men satisfactory to the Southern Pacific Company, and that failure at any time while any part of said loan remains unpaid to elect as members of the board of directors of the California Development Company the three parties named therefor by the Southern Pacific Company, or failure to elect one of said parties as the president and general manager of the California Development Company as in the agreement provided, shall operate to cause and render all the balance of said loan then unpaid to become immediately due and payable. It is further provided that whenever the loan, principle, and interest has been repaid the stock deposited with the pledgee or trustee shall be returned, and then, and not before, the Southern Pacific Company will cause its three directors of the California Development Company to resign as such directors, and the California Development Company will thereupon "resume the full control and management of its affairs and its business." In a contract entered into between the California Development Company, the Mexican Company and the Southern Pacific Company on the same day as the foregoing, it is recited that it is the understanding of all the parties to the contract that a large part of the money so loaned to the California Development Company is for the real use and benefit of the Mexican Company in the work of repairing, constructing, and perfecting its canals and canal headings in the Republic of Mexico, the said loan being entirely made to the California Development Company instead of partly to that company and partly to the Mexican Company for the reason and because of the fact that the Mexican Company is a foreign corporation having all its properties in a foreign country beyond the jurisdiction of the

courts of the United States, and because of the further fact that the proportions of the said loan to be used by the California Development Company and by the Mexican Company cannot in advance be ascertained and determined. It is also recited in the contract that at the time of the agreement to make the loan it was agreed by the Mexican Company that it should guarantee the loan and the repayment thereof. The contract accordingly provides for such a guarantee on the part of the Mexican Company, and that it will cause its board of directors to elect the president and general manager of the California Development Company its general manager, and it will give to said general manager power and authority to handle and dispose of its properties in the Republic of Mexico, with power to contract and agree to furnish water for use on lands in Mexico at a rental of not less than 50 cents gold per acre per foot of water delivered. The contract also provides for the keeping of regular books of account showing the amounts of money advanced or paid out by the California Development Company for the Mexican Company and the amounts of money received by the former company belonging to or for the latter company.

Plaintiff further alleges that the California Development Company has an authorized capital of $1,250,000, divided into 12,500 shares of the par value of $100 each, and that all of said capital stock is outstanding; that the control and management of the affairs of the California Development Company is committed to a board of seven directors, and that said board was at the time of the execution of the contract of June 20, 1905, composed of certain persons whose names are given; that immediately after the execution of said contract three of the persons named resigned as directors, and three other persons were chosen as directors in their places as the representatives of the Southern Pacific Company; that these three directors were at that time and still are agents, employés, and servants of the Southern Pacific Company, and are acting as directors for the benefit and at the behest and under the direction and domination of the Southern Pacific Company; that immediately after these three representatives of the Southern Pacific Company were chosen as directors of the California Development Company one of them was chosen as president of said company, and ever since has acted as president in the interest of the Southern Pacific Company. Plaintiff further alleges that immediately after the execution of the aforesaid contract the Southern Pacific Company took and assumed full control and management of the business and affairs of said California Development Company and ever since has held and still holds such control and management and that the California Development Company has not paid, and by reason of such control by the Southern Pacific Company cannot pay the obligation of $200,000 created under and pursuant to said contract so as to be able to "resume the full control and management of its affairs and business" as provided by said contract; that $150,000 of said sum of $200,000 agreed to be advanced was loaned and advanced to the California Development Company by the Southern Pacific Company on or about July 22, 1905, and the remainder of $50,000 was loaned and advanced on or about September 22, 1905. Plaintiff further alleges

that under the provisions of the contract requiring that the other members of the board of directors of the California Development Company should be "acceptable—that is, not objectionable"—to the Southern Pacific Company, it was possible for the latter company to exclude, and it did exclude, from said board all save persons who would be subservient to the wishes and desires of the Southern Pacific Company; that accordingly the resignation of a fourth director was secured, and two persons were caused to be elected to fill the vacancy in succession, one after the other, and that both are wholly subservient to the Southern Pacific Company; that the object of the Southern Pacific Company in entering into the said contract was the saddling of debts for the maintenance of its right of way upon the California Development Company; that the Southern Pacific Company has railroad interests of vast magnitude and importance compared with which its interests as creditor of the California Development Company is insignificant; that it is indifferent to the interests of the bondholders and stockholders of said corporation; that since securing control of the California Development Company and dominion over its property and assets, the Southern Pacific Company has made large expenditures of money loaned and advanced to the California Development Company under said contract for the benefit of itself—the Southern Pacific Company; that said expenditures have not been made for the benefit of the California Development Company or the said Mexican Company at all, and have not benefited either or both of said companies, and it is charged that upwards of $300,000 has already been expended by the Southern Pacific Company in this way for his own benefit and without benefit to the California Development Company and the said Mexican Company, and saddled upon the California Development Company in the form of a debt to the Southern Pacific Company. Plaintiff further alleges that it is the purpose of the Southern Pacific Company so to manipulate the affairs and assets of the California Development Company that the holdings and interests of the stockholders will be rendered wholly valueless, and the Southern Pacific Company further purposes and intends, after having eliminated the rights and holdings of all the present stockholders of the California Development Company, to sell the valuable water rights of the California Development Company at a large price to the Reclamation Service of the United States, and to reap all the profit and benefit thereof themselves and to the injury of the plaintiff and all other stockholders of the California Development Company; and to accomplish this purpose by means of divers and sundry fraudulent and unlawful devices carried out through its agents and servants who have been made president and directors of the California Development Company, and by virtue of the control and dominion which the Southern Pacific Company has over the California Development Company and its assets and affairs under said contract.

To this amended bill of complaint both the defendants, appearing by the same counsel, demurred, on the ground that the plaintiff, by his own showing, was not entitled to the relief prayed for against the defendants or either of them; that the court had no jurisdiction to hear or determine the suit, and that the bill of the plaintiff is wholly

without equity. The court sustained the demurrer and entered a decree dismissing the bill. The plaintiff has appealed.

It is urged as an objection to the bill that it is without equity, because the money loaned under the contract which it is the object of the suit to cancel has not been restored, and there is no offer of restoration. In our opinion the objection is based upon an erroneous view of the cause of action. The plaintiff does not bring this suit to establish any individual right of his own, but for the benefit of the California Development Company, of which he is a minority stockholder. He has received nothing in the transaction which is the subject of this controversy, and therefore has nothing to restore. His authority to speak for the corporation is to pray the court to do equity in determining the rights of the parties. But the important feature of the cause of action as set forth in the amended bill of complaint is that there is nothing to restore to the Southern Pacific Company by the California Development Company or its stockholders. It is distinctly alleged that the "Southern Pacific Company has made large expenditures of money loaned and advanced to said California Development Company, under said contract * * * for the benefit of itself—the said Southern Pacific Company; that said expenditures have not been made for the benefit of said California Development Company or said Mexican Company at all, and have not benefited either or both said companies * * *: that upwards of $300,000 has already been expended by said Southern Pacific Company in the above way, * * * and without benefit to said California Development Company and said Mexican Company, and saddled upon said California Development Company in the form of a debt to said Southern Pacific Company." There are other allegations in the amended bill charging acts on the part of the Southern Pacific Company to secure the control of the California Development Company for the purpose of making large expenditures to protect its right of way and tracks in the name of and as an indebtedness of said California Development Company and of saddling a large amount of indebtedness therefor upon said California Development Company in the form of a loan by the said Southern Pacific Company. If these allegations are true, and they must be so treated in determining the sufficiency of the bill upon the demurrer, the Southern Pacific Company has appropriated to its own uses and purposes the money it has pretended to loan to the California Development Company, and this it has accomplished under the terms of the contract giving it control of that corporation. The appeal to equity is that the California Development Company may be relieved of this assumed indebtedness by a cancellation of the contract. In this aspect of the case it is manifest that neither the plaintiff nor the California Development Company should be required to offer to restore money the corporation has never received for its own use or benefit. If the court shall hereafter ascertain the fact to be otherwise than as alleged in the bill, it will direct the parties to do equity in accordance with such facts.

The next question to be determined is whether the contract is ultra vires. Section 12 of the act of the Legislature of New Jersey (P. L. 1896, p. 281), under which the California Development Company was incorporated on or about the 23d day of April, 1896, provides:

"The business of every corporation shall be managed by its directors, who shall respectively be shareholders therein; they shall be not less than three in number, and, except as hereinafter provided (the exception is not material in this case), they shall be chosen annually by the stockholders at the time and place provided in the by-laws, and shall hold office for one year and until others are chosen and qualified in their stead."

Under the law the control and management of the affairs of the California Development Company was committed by its incorporators to seven directors. In paragraph 2 of the agreement of June 20, 1905, the California Development Company by its president and secretary agreed to cause three members of its board of directors as then constituted to resign and in their places and steads to cause to be elected three parties to be selected for that purpose by the Southern Pacific Company. The provision of the statute that the directors shall be shareholders and shall be chosen annually by the stockholders appears to be set aside by this agreement as to three of the seven directors, and the selection of these three directors vested in the Southern Pacific Company "during the continuance of the whole or any part of said loan unpaid."

Section 13 of the New Jersey act provides that:

"Every corporation organized under this act shall have a president, secretary and treasurer, who shall be chosen either by the directors or stockholders, as the by-laws may direct, and shall hold their offices until others are chosen and qualified in their stead."

In paragraph 2 of the agreement it is provided that upon the election of the three directors selected by the Southern Pacific Company the California Development Company is to cause the other members on said board then in California to vote for and elect one of the three directors so selected and named by the Southern Pacific Company to the office of president and general manager of the California Development Company and its business. It is further provided in the agreement that in the event of any vacancy occurring in the office of director held by either of said persons elected by the Southern Pacific Company or in said office of president, then the California Development Company shall cause such person to be elected to said office as the Southern Pacific Company shall designate, provided that such president shall be acceptable—that is, not objectionable—to at least two members of the board other than those named by the Southern Pacific Company. It is further provided that in addition to having the right of nominating three members of said board of directors as provided in the agreement all members of the board shall be acceptable—that is, not objectionable—to the Southern Pacific Company. Under the agreement, the president of the corporation, instead of being chosen either by the directors or stockholders, as the by-laws may provide, is selected by the Southern Pacific Company. The law requires that the secretary like the president shall be chosen either by the directors or stockholders as the by-laws may direct. In paragraph 3 of the agreement it is provided that the president and general manager of the California Development Company so selected shall have the power to name the secretary, acting superintendent, chief engineer and consulting engineer of the corporation, the persons so named, however,

to be acceptable to at least two members of the board of directors of the corporation other than those named by the Southern Pacific Company. These provisions of the agreement are clearly contrary to the provisions of the law under which the corporation was organized, and are contrary to the laws of this state, under which it is exercising its authority and doing business as a corporation.

There is, however, another provision of the agreement to be considered in this connection. It is provided in paragraph 4 of the agreement that to further secure the loan and its repayment with interest the California Development Company agrees to procure certain of its stockholders to pledge 6,300 shares of its capital stock to be deposited with a trustee to be selected by the Southern Pacific Company, the owners of the stock to execute to the trustee so selected irrevocable powers of attorney or proxies giving to said trustee the right to vote said stock at all meetings of stockholders of the California Development Company held after 90 days' default in payment of any installment of said loan or in performance of any other of the conditions of the agreement on the part of the California Development Company and while such default continues. Does this power of control given to the Southern Pacific Company over the affairs of the California Development Company by the transfer of a majority of its shares of stock render immaterial the method provided in the agreement for the selection of the officers of the corporation and their terms of office? In other words, if the Southern Pacific Company has secured the control and management of the California Development Company by procuring the control of a majority of its shares, and is thus enabled to elect its officers and direct its affairs, is it of any consequence that the agreement provides a method wholly at variance with the law for the selection of such officers and their terms of service?

We are of opinion that the method provided by the statute for the election of the officers of the corporation, their qualification, and their terms of service cannot be set aside even by the vote of the majority of the shareholders. But, aside from the conflict between the terms of the agreement and the law under which the California Development Company was incorporated, the action of the corporation in carrying out the terms of the agreement as alleged in the bill amounts to a complete surrender of the management and control of the California Development Company to the Southern Pacific Company, another corporation formed for a different purpose and carrying on a wholly different business. The purpose of a grant of corporate power is that the corporation shall exercise its powers and carry on its business through its own officers and agents and not through officers and agents selected by another corporation. 1 Mor. Priv. Corp. p. 431; Buckeye Marble & Freestone Co. v. Harvey, 92 Tenn. 115, 20 S. W. 429, 18 L. R. A. 252, 36 Am. St. Rep. 71. And that it shall maintain an independent corporate existence, and not surrender the control of its affairs or the exercise of its power to another corporation. Anglo-American Land M. & A. Co. v. Lombard, 132 Fed. 721, 736, 68 C. C. A. 89. There are undoubtedly instances where the control and management of one corporation by another is justified by the character of the business in which they are engaged, and the complete harmony of

interests existing between the two corporations. The control and management of the Mexican Company by the California Development Company as set forth in the bill appears to be such a case, but we have found no case where the courts have sanctioned such control and management where there are conflicting interests of the character charged in the bill as existing between the California Development Company and the Southern Pacific Company with respect to the business and affairs of the former corporation. The surrender of corporate authority on the part of the California Development Company, as set forth in the bill, is manifestly against public policy, and the contract under which the surrender is made so clearly contrary to the law under which the corporation was created that it must be declared ultra vires and void.

The defense of estoppel is not applicable to the facts as stated in the bill of complaint. If the money loaned under the agreement by the Southern Pacific Company to the California Development Company has been expended by the Southern Pacific Company for its own use and benefit, and not for the use or benefit of the California Development Company or the Mexican Company the rule of estoppel does not apply, nor does it apply to the ultra vires agreement alone. The Supreme Court of the United States in Central Transportation Co. v. Pullman Car Co., 139 U. S. 59, 11 Sup. Ct. 478, 35 L. Ed. 55, has stated the rule applicable to this case as follows:

"A contract of a corporation, which is ultra vires in the proper sense— that is to say, outside the object of its creation, as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature—is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the Legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws."

The rule is also applicable to the further objection that the plaintiff has been guilty of laches, and is therefore estopped by his conduct from maintaining this action. Furthermore, the agreement in controversy is dated June 20, 1905. The amended bill was filed February 12, 1906. When the original bill was filed does not appear. There is therefore nothing in the record that would justify the court in determining that the plaintiff had been guilty of laches in bringing the action. In any view of the case the court cannot apply the law of estoppel to plaintiff's conduct.

The decree of the Circuit Court is reversed, with directions to overrule the demurrer.

ROSS, Circuit Judge (dissenting). I am unable to agree to the judgment in this case. The appellant sued as a dissatisfied stockholder

of the California Development Company, and as such only. Manifestly, therefore, he can have no other or greater right to maintain the suit than would that corporation, were it the complainant. Smith v. Ferries & C. H. Ry. Co. (Cal.) 51 Pac. 715, 716; Chetwood v. Cal. National Bank, 113 Cal. 425, 45 Pac. 704; Garretson v. Pacific Crude Oil Co., 146 Cal. 184, 79 Pac. 838; 10 Cyc. 1160. Would the California Development Company be entitled to the relief here sought upon a like bill? I think not. In the bill, these, among other facts, are expressly alleged:

"12. Your orator shows that heretofore and some time in or about the spring and summer of 1904, by reason of the incompetency of one C. R. Rockwood, the engineer of said California Development Company, silt was allowed to accumulate in the intake for said water in that portion of the canal of said company adjacent thereto, whereby it was difficult to divert the needed water from said Colorado river into the canals of said California Development Company; that thereafter and some time in or about the month of September, 1904, said Mexican Company caused a cut to be made in the bank of said Colorado river and in the Republic of Mexico, and at a place where the bed of said river was much higher than said Mexican Company's canal; that the soil was loose and unstable at said point, and the said river gradually widened a breach in its said bank at said point until it became impossible to control or manage the flow of said river; that said intake gradually became, and now is, the bed of the entire Colorado river along and upon which the entire waters of said river flow; that the lands irrigated by the water so appropriated and diverted by said California Development Company are all below sea level and much lower than the old bed of the Colorado river, from which said waters are taken; and that further westward is a vast area or basin lying many feet below sea level, into which said waters were, by said new cut and point of diversion, caused to flow, and now are flowing, which said basin is known as 'Salton Basin.' That said waters have now covered about 400 square miles of said basin and are gradually rising therein.

"13. Your orator further shows that the defendant Southern Pacific Company operates a line of railroad through and across said Salton Basin, which line at some points is more than two hundred feet below sea level; that some time in the month of February or March, 1905, the inflow of water from the Colorado river to said Salton Basin began to approach and threaten to submerge the railroad tracks of said Southern Pacific Company at different points in said Salton Basin; that, as your orator is informed and believes, and upon such information and belief alleges, at or about said time said Southern Pacific Company realized that a continuance of said inflow into said Salton Basin from the said Colorado river would compel it to abandon many miles of its said railroad or remove the same to higher ground, which would involve great expense to it; and that, at or about said time, said Southern Pacific Company conceived the purpose of acquiring control of the defendant California Development Company, upon the pretext of being interested in aiding said company in its colonization and development work, but in reality for the purpose of making large expenditures to protect its right of way and tracks in the name of, and as an indebtedness against, said California Development Company, and of saddling a large amount of indebtedness therefor upon said company, in the form of loans from the said Southern Pacific Company. * * *

"15. That, at the time said Southern Pacific Company conceived the purpose of gaining control of said California Development Company as aforesaid, said California Development Company was in financial straits and its credit was greatly impaired, and its then president, A. H. Heber, had been obliged to pledge his personal assets to obtain loans for the company; and that, by reason of such financial difficulties, said company was constrained, by its necessitous condition, to accept a loan of $200,000, offered by said Southern Pacific Company some time in or about the month of May, 1905; that, by the terms of said loan, said California Development Company agreed to give to the Southern Pacific Company control of its board of directors and of all its affairs, until

such time as it should repay said loan with interest, and in addition and at the same time said Southern Pacific Company got control of a majority, to wit, 6,300 shares of its capital stock, by way of pledge; that said agreement was so worded and drawn that it became forthwith hopelessly impossible for said California Development Company ever to extricate itself from the terms thereof, and said Southern Pacific Company then and there became a creditor in possession and having complete dominion and control over the assets of said California Development Company; that all of the foregoing and other provisions of said agreement more fully appear from said agreement," which agreement, together with the agreement between the development company, the Mexican Company, and the Southern Pacific Company, which is annexed to and made a part of that between the development company and the Southern Pacific Company, are fully set out in the bill—that between the development company and the Southern Pacific Company reciting:

" 'That, whereas party of the first part (the development company) is desirous of borrowing from party of the second part (the Southern Pacific Company), on the terms hereinafter set out, the sum of two hundred thousand ($200,000.00) dollars to be used by it in paying off certain of its floating indebtedness, and in completing and perfecting the canal system of first party and of that certain corporation known as the Mexican Company; and whereas, on the terms and conditions hereinafter set out, party of the second part is willing to make such loan; now therefore, in consideration of the premises aforesaid and of the several mutual covenants and promises herein contained, the parties hereto do hereby covenant, promise and agree as follows, to wit: 1. Party of the second part is to loan and advance to party of the first part, and at once pay into its treasury the sum of two hundred thousand ($200,-000.00) dollars; which said loan is to be repaid by first party to second party on or before March 1st, 1911, in installments as follows: Twenty thousand ($20,000.00) dollars on or before March 1st, 1907; thirty thousand ($30,000.00) dollars on or before March 1st, 1908; forty thousand ($40,000.00) dollars on or before March 1st, 1909; fifty thousand ($50,000.00) dollars on or before March 1st, 1910; and sixty thousand ($60,000.00) dollars on or before March 1st, 1911—all deferred payments to bear interest from date of advancement and payment of the money hereunder to first party, until paid, at the rate of six (6) per cent. per annum, payable semiannually, and which said sum, with the interest thereon, first party agrees to pay to second party in installments as above fixed and set out,' etc., etc., and the annexed agreement between the development company, the Mexican Company, and the Southern Pacific Company, reciting: 'That whereas parties of the first (the development company) and third (the Southern Pacific Company) parts, at the time of the execution hereof as a part of this same transaction, have entered into and executed the foregoing and annexed contract or agreement in writing; and, whereas, under said agreement, party of the third part (the Southern Pacific Company) is to loan and advance to party of the first part (the development company) the sum of two hundred thousand dollars ($200,000.00) therein mentioned under the terms and conditions and for the purposes mentioned in said foregoing contract; and, whereas, it is the understanding of all the parties hereto that a large part of the money so loaned to party of the first part (the development company) is for the real use and benefit of party of the second part (the Mexican Company) in the work of repairing, construing (constructing) and perfecting its canals and canal headings in the Republic of Mexico, the said loan being entirely made to party of the first part (the development company) instead of partly to party of the first part (the development company) and partly to party of the second part (the Mexican Company), for the reason and because of the fact that party of the second part (the Mexican Company) is a foreign corporation having all of its properties in a foreign country, beyond the jurisdiction of the courts of the United States, and because of the further fact that the proportions of the said loan to be used by party of the first part (the development company) and by party of the second part (the Mexican Company) cannot in advance be ascertained or determined; and, whereas, at the time of the agreeing to the making of said loan, it was agreed by party of the second part (the Mexican Company) that it should guarantee the said loan and the repayment thereof; now, therefore, in consideration of

the premises aforesaid, and in consideration of the entering into and execution of the foregoing contract hereto annexed, the said parties of the first and second parts do hereby covenant, promise, and agree' as specifically set forth in the agreement."

The bill further expressly alleges "that $150,000 of said sum of $200,000 so agreed to be advanced was loaned and advanced to said California Development Company by defendant Southern Pacific Company on or about July 22, 1905, and the remainder, to wit, $50,000 was so loaned and advanced on or about September 22, 1905."

The twentieth paragraph of the bill is as follows:

"Your orator further shows that since securing control of said California Development Company and dominion over its property and assets, as hereinabove stated, defendant Southern Pacific Company has made large expenditures of money loaned and advanced to said California Development Company, under said contract set forth in paragraph 15 hereof, for the benefit of itself—the said Southern Pacific Company; that said expenditures have not been made for the benefit of said California Development Company or said Mexican Company at all, and have not benefited either or both said companies, and your orator is informed and believes, and upon such information and belief charges the fact to be, that upwards of $300,000 has already been expended by said Southern Pacific Company in the above way, and for its own benefit and without benefit to said California Development Company and said Mexican Company, and saddled upon said California Development Company in the form of a debt to said Southern Pacific Company."

It thus appears from the express averments of the bill itself that the Southern Pacific Company loaned to the California Development Company, and paid into its treasury, the sum of $200,000 upon the terms and conditions stated in the two agreements above referred to, and while the bill does allege in the paragraph last above quoted that the Southern Pacific Company "has made large expenditures of money loaned and advanced to said California Development Company, under said contract set forth in paragraph 15 hereof, for the benefit of itself, the said Southern Pacific Company, and that said expenditures have not been made for the benefit of said California Development Company or said Mexican Company at all, and have not benefited either or both said companies," it does not allege how much of the money so loaned and advanced to the California Development Company the Southern Pacific Company has expended for its own exclusive benefit. There is no averment that all of the money loaned by the Southern Pacific Company to the development company was expended by the former for its own benefit. The general allegation contained in paragraph 20 of the bill "that upwards of $300,000 has already been expended by said Southern Pacific Company in the above way, and for its own benefit and without benefit to said California Development Company and said Mexican Company, and saddled upon said California Development Company in the form of a debt to said Southern Pacific Company," is far from being an averment that all of the money loaned by the latter company to the California Development Company was expended by the Southern Pacific Company for its own benefit. It should be remembered that the rule is well established that pleadings must be taken most strongly against the pleader, and that **a** demurrer admits only the truth of such facts as are well pleaded. Nei-

161 F.—2

ther the alleged conclusions nor inferences of the pleader amount to anything.

In my opinion the court below was right in holding the complainant's suit subject to the maxim that "he who seeks equity must do equity," and that without the return of at least such of the money loaned by the Southern Pacific Company to the development company, of which the complainant was a stockholder, that was not expended by the Southern Pacific Company for its own exclusive benefit, he could not be entitled to the relief sought.