[L. A. No. 3848.   In Bank.—October 9, 1915.]

TITLE INSURANCE AND TRUST COMPANY, a Corporation, Respondent, v. CALIFORNIA DEVELOPMENT COMPANY, a Corporation et al., Defendants; SOUTHERN PACIFIC COMPANY et al., Appellants; NEW LIVERPOOL SALT COMPANY, Cross-complainant and Respondent; BOAZ DUNCAN, Intervener and Respondent; W. H. HOLABIRD, Receiver, Respondent.

APPEAL—NEW METHOD—NOTICE NEED NOT BE ADDRESSED TO ADVERSE PARTIES.—Where a notice of appeal is filed within the time limited by the new and alternative method of appeal provided by section 941b of the Code of Civil Procedure, the failure to address the notice to all of the adverse parties, or any of them, did not affect the validity of the appeal.

ID.—NEW TRIAL—NOTICE OF INTENTION—SERVICE MUST BE HAD ON ADVERSE PARTIES.—In the absence of service on the adverse party of notice of intention to move for a new trial, the lower court has no authority to grant such motion. An "adverse party" is one whose interest in the subject matter of the motion is adverse to or

will be affected by the granting of the motion or changing the former decision of the court.

ID.—WANT OF SERVICE—DEFECT NOT CURED BY VOLUNTARY APPEARANCE. The voluntary appearance of unserved adverse parties and their consent to the hearing of the motion, given after the expiration of the time to serve notice of intention, could not cure the want of service. The court itself had no authority to relieve the moving parties from the consequences of their failure to serve notice in time, as its jurisdiction of the motion depended on timely service and filing of the notice.

ID.—MOTION TO ENTER DIFFERENT JUDGMENT.—The foregoing rules as to service of notice on adverse parties are applicable to motions for the entry of a different judgment.

ID.—APPEAL FROM JUDGMENT—CONSIDERATION OF BILL OF EXCEPTIONS.— A bill of exceptions on an appeal from a judgment, even though not served upon certain adverse parties, may be considered, and the judgment modified in so far as such modification may be ordered without impairing the rights of the parties not served.

ID.—SETTLEMENT OF BILL—RELIEF FROM DEFAULT IN SERVICE—DELAY CURED BY CONSENT.—Opposition to the settlement of a bill of exceptions for failure of timely service is a "proceeding against a party," and the trial court may relieve the defaulting party under section 473 of the Code of Civil Procedure; and as jurisdiction of the subject matter does not depend on prompt service, the delay in service may be cured by the voluntary consent and waiver of the parties not served.

ID.—RECORD ON APPEAL FROM JUDGMENT—BILLS OF EXCEPTIONS.—On an appeal from a judgment, the record includes any bill of exceptions in the case upon which the appellant relies, and consequently a supplemental bill, showing a waiver of service of a main bill of exception used on a motion for a new trial, may be considered.

EQUITABLE JURISDICTION—DECREE OPERATING IN PERSONAM—PROPERTY WITHOUT JURISDICTION OF COURT.—A court of equity, having acquired jurisdiction of the parties, may by a decree operating on them *in personam* control their actions with regard to properties situated without the jurisdiction, when such action is necessary for a complete disposition of the controversy before the court.

ID.—FORECLOSURE OF ENTIRE PROPERTY OF WATER SYSTEM — PORTION SITUATED IN FOREIGN COUNTRY.—This rule is applicable to an action to foreclose a mortgage deed of trust on a canal system situated partly in the republic of Mexico and partly in the state of California, where such system was essentially a single and indivisible entity, and it was the intention of all the parties in interest to subject the entire system to the lien of the bonds issued under the deed of trust.

ID.—EQUITABLE LIEN ON PROPERTY IN FOREIGN STATE—CONSTRUCTION OF DEED OF TRUST AND MORTGAGE.—While the deed of trust to fore-

. close which this action was brought did not in terms purport to convey to the trustee as security for the bonds to be issued thereunder the legal title to the Mexican properties forming an integral part of the canal system in question, its provisions, together with the provisions of a mortgage executed by a Mexican corporation, a subsidiary of the trustor and the holder of the legal title to such Mexican properties, show that the trustee, as security for such bonds, obtained an equitable lien upon all of such Mexican properties.

ID.—INTENTION TO CREATE EQUITABLE LIEN—FOREIGN MORTGAGE INVALID FOR NONREGISTRATION.—The intention of the parties is the paramount factor in determining whether or not an equitable lien has been created, and the mortgage of the Mexican properties is available as evidence of such intention, notwithstanding it was not effective under the laws of Mexico as a legal conveyance or charge, for the reason that it was not registered.

ID.—EQUITABLE LIEN, WHEN CREATED.—Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice.

ID.—MORTGAGE OF REAL AND PERSONAL PROPERTY CONSTITUTING AN ENTIRETY—FORECLOSURE SALE—NO RIGHT OF REDEMPTION.—Where a mortgage covers real and personal property, comprising parts of a single working plant or utility, in which each part is necessary to give value to the others, and where a dismemberment of the system would destroy or greatly impair the usefulness or value of its component parts, it is proper, in the foreclosure decree, to direct a sale of all the properties, both real and personal, as an entirety and without right of redemption. The statute giving a right of redemption upon execution sales of real property has no application to such cases.

ID.—EXECUTION SALE OF EXTENSIVE IRRIGATION SYSTEM—NO RIGHT OF REDEMPTION EXISTS.—Such rule is not limited to the execution sales of the property of railroads or public service corporations, and is applicable to the sale of the properties of a corporation operating a very extensive irrigation system for the distribution of water, although it was not engaged in the administration of a public use.

ID.—CORPORATIONS — INSOLVENCY—DEBTOR HAVING ACTUAL CONTROL—FIDUCIARY RELATION—CANNOT OBTAIN ADVANTAGE OVER OTHER CREDITORS.—A creditor of an insolvent debtor corporation, having secured and exercising an actual control of the debtor through the control of its directorate and the management of its business, occu-

pies a fiduciary relation to the debtor and its stockholders and creditors, and in his dealings with the corporation is subject at least to the restrictions which are imposed on a director, and cannot secure to himself any advantage or preference over other creditors.

ID.—TRANSFER TO CREDITORS BY MEANS OF COLLUSIVE JUDGMENTS.—Such a creditor cannot employ its control of the debtor corporation so as to have the property of the debtor transferred to himself or his agent through the means of a collusive judgment, to the detriment of bondholders having a prior equitable lien on the property, of which the creditor had notice.

ID.—COLLUSIVE FOREIGN JUDGMENTS—POWER OF CALIFORNIA COURTS TO GO BEHIND AT INSTANCE OF DEFRAUDED CREDITORS.—In an action in equity instituted in California, to subject to the equitable lien of such bondholders property of the debtor in Mexico which such creditor had acquired through the means of collusive judgments of a Mexican court, the court, having jurisdiction of all the parties, and acting *in personam*, may go behind the Mexican proceedings and compel the creditor seeking to benefit by them to make an equitable application of the assets so improperly acquired. Such Mexican judgments may be attacked as fraudulent without a showing that the claims upon which they were rendered were not meritorious.

ID.—CONSENT DECREE—EXECUTION SALE UNDER A VOLUNTARY TRANSFER. An execution sale under a consent judgment, where the consent is, in effect, not the act of the defendant but that of the plaintiff prosecuting the action, is in reality merely a voluntary transfer.

ID.—FORECLOSURE OF EQUITABLE LIEN—ADVERSE TITLE—TITLE ACQUIRED BY DISTINCT CORPORATION UNDER COLLUSIVE JUDGMENT.—The fact that such creditor took title to the Mexican property so collusively acquired in the name of a distinct corporation organized for that purpose does not render the title of that corporation adverse, so as to prevent its adjudication in the suit to foreclose the prior equitable lien of the bondholders.

ID.—TITLE ACQUIRED IN FRAUD OF MORTGAGEE.—The court is not precluded from considering adverse claims in a foreclosure suit, where it is charged that the alleged adverse claim was acquired fraudulently and for the purpose of defeating the rights of the mortgagee.

ID.—CREDITOR'S BILL—ACQUISITION OF EQUITABLE LIEN.—A judgment creditor, by filing a bill to subject assets of the judgment debtor to the payment of his judgment, acquires an equitable lien upon the debtor's properties therein described.

ID.—TRANSFER IN FRAUD OF CREDITORS—FRAUDULENT INTENT—ATTACK BY CREDITORS.—A transfer made with intent to defraud any creditor of his demands is void against all creditors of the debtor. The question of fraudulent intent is one of fact and not of law, and if that intent is made out, it is not necessary to show that the debtor was insolvent at the time. Such a transfer may be good as against

the transferrer and yet void as against its creditors, and the latter cannot, by a judicial proceeding to which they were not parties, be deprived of the right to attack it as fraudulent.

Id.—Attachment of Corporate Property by Director—Adverse Action—Priority Against Subsequent Lienors.—A director of a corporation, or one occupying a similar fiduciary relation, who is also a creditor, is not precluded from enforcing the rights which he would have if he occupied the status of creditor alone. He may bring an adversary action against the corporation, and levy an attachment thereon, and avail himself of the rights of priority secured by the attachment as against subsequent lienors.

Id.—Fraudulent Attachment—Subsequent Lienors may Show.—The subsequent lienors may attack such an attachment for actual fraud in its creation, and the right to. attack it is not impaired by the judgment recovered by the attaching creditor.

Id.—Attachment of Insolvent Debtor—Securing Preference.—A creditor has a right to levy an attachment upon property of his debtor even though he knows his debtor to be insolvent and levies the attachment for the purpose of securing thereby a preference over other creditors, and also for the purpose of strengthening a title claimed under a previous defective conveyance.

Id.—Attachment Cannot be Attacked for Mere Irregularities—False Statement in Affidavit.—Where there was, in the beginning of an attachment suit, or in the obtaining of the attachment, no fraudulent invasion of the rights of a subsequent lienor, the latter cannot question the sufficiency of the attachment lien on the ground that the affidavit for attachment was false in alleging that it was not sought nor the action instituted for the purpose of hindering, defrauding or delaying any creditor of the attachment debtor.

Id.—Attachment Against Nonresident Defendants — Immaterial Averment That Claim is Unsecured.—Under section 537 of the Code of Civil Procedure, the limitation of the right of attachment to actions upon unsecured contracts applies only where the defendants reside in this state, and in an action against a nonresident, where the affidavit for attachment shows the fact of nonresidence, it is immaterial to the validity of the attachment that the affidavit falsely states that the claim sued on is unsecured.

Id.—Laches of Attaching Creditor—Delay in Asserting Right.— In an action of foreclosure, involving the relative rights in the mortgaged property of. a prior attaching creditor and a subsequent judgment creditor of the mortgagor, the delay of the former in asserting his rights under the attachment for two years after its levy is not such laches as to render it inequitable for him to claim a priority of lien against the judgment creditor, where such delay in no way operated to the prejudice of the rights of the latter.

CLXXI Cal.—12

ID.—FORECLOSURE AGAINST SUBORDINATE LIENORS—SALE OF MORTGAGED PROPERTY AS A WHOLE.—In an action to foreclose the prior lien of bondholders under a deed of trust covering real and personal property constituting an entire irrigation system, the fact that certain of the defendants have subordinate liens on portions of the mortgaged property, with rights of priority therein as between themselves, does not impair the right of the bondholders to have the property sold as a whole.

ID.—RIGHTS OF SUBORDINATE LIENORS AGAINST PORTIONS OF PROPERTY—PRESERVATION OF RIGHT OF PRIORITY IN PROCEEDS OF SALE—APPRAISEMENT OF PROPERTY BY TRIAL COURT.—In such a case, for the purpose of preserving the relative rights of priority of the subordinate lienors in the proceeds of the sale, the decree should direct a sale of the property as a whole, and an appraisement should be had, under the direction of the trial court, of the proportionate values of the portions of the property affected by the subordinate liens and the remainder of the mortgaged property, to the end that the surplus proceeds, after paying the prior claims of the bondholders, may be apportioned between the subordinate lienors in proportion to the value of the parts of the entire property upon which they are respectively entitled to priority.

ID.—TIME OF MAKING APPRAISEMENT—DISCRETION OF TRIAL COURT.—Whether the sale should precede or follow such determination of the values of the parts of the property in which the subordinate lienors are, respectively, entitled to priority, is a question to be answered in the first instance by the trial court, and determined by it in the exercise of a sound discretion after a consideration of all the equities involved.

ID.—INVOLUNTARY TRUSTEE—REIMBURSEMENT FOR ADVANCES.—An involuntary trustee, who becomes such through his own fault, is not entitled to reimbursement for advances made and devoted to the preservation of the trust property.

EVIDENCE—PRIVILEGED COMMUNICATIONS—PLACING LETTERS IN HANDS OF STRANGERS.—Where written communications, originally of a privileged character, are voluntarily given into the hands of third persons, the privilege attaching thereto is waived.

ID.—LETTER FROM ATTORNEY TO ATTORNEY OF RECEIVER.—A letter written by the general counsel of one of the subordinate lienors to the attorney for the receiver of the mortgaged property, who was not acting for the lienor, is not privileged.

APPEALS from a judgment of the Superior Court of Los Angeles County, from orders refusing a new trial, and from orders refusing to vacate the judgment and to enter a different judgment.   Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Eugene S. Ives, Irving M. Walker, and Joseph H. Call, for Appellants.

O'Melveny, Stevens & Millikin, Lee C. Gates, and Walter K. Tuller, for Plaintiff and Respondent.

Page, McCutchen, Knight & Olney, and McCutchen, Olney & Willard, for Respondent New Liverpool Salt Company.

Valentine & Newby, for Intervener and Respondent.

W. B. Mathews, and S. B. Robinson, for Receiver.

SLOSS, J.—This litigation involves the determination of the rights asserted by various parties in the property constituting the canal and irrigation system constructed and developed for the purpose of diverting water from the Colorado River and applying it to the irrigation of certain lands in Imperial County in this state, and of a tract of land in the republic of Mexico. In the sharp controversy between the different parties, many points of conflict arose with respect to both the law and the facts. The discussion of these may well, however, be preceded by a general outline of the undisputed facts, or so many of them as will serve to give an understanding of the situation presented when the action was instituted and during its progress in the court below.

Before the construction of the irrigation system, the lands which it now supplies, in California as well as in Mexico, constituted arid and desert wastes. In the absence of adequate moisture—and this is not afforded by the very slight fall of rain in these regions—the soil was, and would now be, totally unproductive. A large part of this tract, covering an area of many square miles, and known as the Salton Sink, lies below the level of the sea. The Colorado River runs along the eastern boundary of the county of Imperial before entering into the Mexican territory of Lower California. C. R. Rockwood, one of the defendants in this case, believing that much of the land in and near the Salton Sink could be rendered subject to highly profitable cultivation if properly irrigated, undertook the formation and execution of a plan,

deemed feasible from an engineering standpoint, for the diversion of water from the Colorado River for this purpose.

A range of hills or high land lies between the Colorado River and the lands in Imperial County which were to be irrigated, and great if not insuperable difficulties would have been involved in bringing water to these lands by means of a canal located entirely within the state of California. The plan adopted and subsequently carried out was, therefore, to construct an intake on the bank of the Colorado River at a point known as Hanlon's Heading, about a mile north of the international boundary line, and to construct a canal from that point to and across the boundary line, the canal to run for a length of some sixty miles through Mexican territory, after which it would again cross the boundary line into the state of California, where by a system of further canals and ditches the water was to be distributed to the lands to be irrigated in this state.

Together with certain associates, including W. T. Heffernan and H. W. Blaisdell, Rockwood, in 1896, organized under the laws of the state of New Jersey a corporation known as California Development Company, with a capital stock of twelve thousand five hundred shares of the par value of one hundred dollars per share. The necessity for diverting the canal into foreign territory was known when the California Development Company was organized, and the organizers of the company contemplated, from the outset, the irrigation of lands in both countries. Under the laws of Mexico foreign corporations were not permitted, without the consent of the Mexican government, to hold title to real estate within a zone which included the route of the portion of the projected canal within Mexican territory. Earnest efforts were made by Rockwood and his associates to obtain the requisite consent, but these efforts were futile, and in 1898 the difficulty was met by the formation of a Mexican corporation known as La Socieda de Irrigacion y Terrenos de la Baja California (Sociedad Anonima), which was to hold title to the canal and other real property embraced in the scheme and lying within the republic of Mexico. This corporation is designated in the record as the "Mexican company" and will be so termed in this opinion. The required lands in Mexico were owned by one Andrade, and Rockwood had acquired from Andrade an option entitling him to purchase these lands,

which comprised an area of about one hundred thousand acres. This option had been taken for the benefit of the California Development Company and was transferred to it. The Mexican company was organized with the same capital as the development company, i. e., twelve thousand five hundred shares, of the par value of one hundred dollars each. Twelve thousand of these shares were issued to Andrade, who, in consideration thereof, conveyed the property covered by the option to the Mexican company. The California Development Company then purchased from Andrade the twelve thousand shares of the stock, paying him the consideration specified in the option which it had theretofore held. The remaining five hundred shares of stock in the Mexican company were issued to Heffernan and Blaisdell under circumstances which will be detailed hereafter.

On June 1, 1900, the California Development Company executed to the plaintiff herein, Title Insurance and Trust Company, as trustee, a deed of trust or mortgage of all properties standing in its name, to secure an issue of bonds to the amount of five hundred thousand dollars, the proceeds of which were to be expended in the construction of the irrigation system. Bonds to the amount of $477,920 were issued.

On December 28, 1900, the California Development Company entered into a contract with the Mexican company whereby the development company agreed to build the canals required in Mexican territory and to furnish the necessary water for irrigating lands in Mexico.

The irrigation system was thereupon begun and carried to completion.. As is well known, the results, so far as concerns the agricultural development of the lands in this state which were to be furnished with water, have exceeded the most sanguine expectations. In consequence of this scheme of irrigation, the district now known as the Imperial Valley, comprising a large tract of land of great fertility, has been brought under cultivation, furnishing homes to thousands of settlers.

The defendant, New Liverpool Salt Company, owned and operated a plant at the bottom of the Salton Sink for the extraction and refining of salt. It also owned salt deposits near its works. In 1904 the California Development Company, which had been taking water through its intake at Hanlon's Heading, cut an additional intake, at a point within

Mexican territory, through the banks of the Colorado River. For one reason or another, the works constructed to control the new diversion proved inadequate, and consequently a flood of water, comprising virtually the entire flow of the Colorado River, poured through the break thus made in the bank and found its way into the Salton Sink. The lower land, including all of that owned by the New Liverpool Salt Company, was soon flooded and there was thus created a large inland lake, which has become known as the Salton Sea, and remains to this day. In February, 1905, the New Liverpool Salt Company brought an action against the California Development Company to recover the value of its property destroyed, basing its claim upon the alleged negligent action of the defendant in cutting the bank of the Colorado River and thus permitting the flow of water into the Salton Sink. This action finally resulted in the entry of a judgment in favor of the New Liverpool Salt Company for $458,246.23, with interest from January 10, 1908, the date of entry. The judgment became final by affirmance on appeal. Meanwhile the vast flow of water which had been permitted to escape through the new intake was endangering, not only the property of the salt company, but the entire system of irrigation canals and the lands supplied by them in Imperial Valley, as well as the tracks and appurtenances of the Southern Pacific Company, which operated a line of railway through the affected territory. The California Development Company was without the means to control this flow. At this juncture it applied to the Southern Pacific Company for a loan of two hundred thousand dollars to enable it to do the work necessary to retain the river within its banks and thus obviate the threatened destruction. The Southern Pacific Company granted the loan upon terms embodied in a contract under date of June 20, 1905. The amount advanced proved to be insufficient to complete the work, and additional sums aggregating many times the amount originally advanced were furnished from time to time by the Southern Pacific Company and applied to the work of checking the flow. This object was eventually accomplished. The Southern Pacific Company took various steps to secure the repayment of its advances. Among other things, it obtained two judgments against the Mexican company in the Mexican courts, one for nine hundred and fifty thousand dollars and another for six

hundred and fifty thousand dollars. Under the latter judgment an execution sale was had and the properties of the Mexican company were bought in by a Mexican corporation known as Compania de Terrenos y Aguas de la Baja California (Sociedad Anonima), which had been organized by the Southern Pacific Company for this purpose. This corporation is described in the record and will be here described as the "New Mexican company."

The present action was instituted for foreclosure under the deed of trust executed to plaintiff to secure the bonds, the California Development Company having defaulted in the payment of interest, and the deed of trust providing that the principal sum might be declared due under certain conditions in the event of such default. The complaint, which was filed in December, 1909, alleged a default in the payment of the interest coupons due on June 1, 1908, and a notice by the plaintiff on December 9, 1909, that it declared the principal of the outstanding bonds to be immediately due and payable. By the complaint, the Southern Pacific Company and two affiliated railway corporations, the New Liverpool Salt Company, A. N. Jones, M. H. Holland, and C. R. Rockwood, were made defendants under an allegation that they claimed interests in the property which were subordinate to the lien of plaintiff's mortgage or deed of trust. Boaz Duncan, as the owner of bonds to the amount of $165,120, intervened. Subsequently Perry, Flores, and Heffernan, and also the two Mexican corporations, were brought in as parties defendant. Appeals from the judgment were sought to be taken by the California Development Company and by Heffernan, Flores, Rockwood, and Perry, but these appeals have heretofore been dismissed by this court. (*Title Insurance & Trust Co.* v. *California Development Co.*, 168 Cal. 397, [143 Pac. 723].) It may be added that a receiver of the properties was appointed at an early stage of the litigation and that there were issued, pursuant to the orders of the court, receiver's certificates in an amount exceeding three hundred thousand dollars.

The pleadings in the action cover some nine hundred pages of the printed transcript, and it would obviously be impracticable to attempt to even summarize their contents. The nature of the various contentions made will sufficiently appear from a brief review of the findings. The court finds, in sub-

stance, that the lien of the deed of trust is a lien on all the property therein described, prior and superior to any right or interest owned, held, or claimed by any of the defendants, except that receiver's certificates in the sum of three hundred . and fifteen thousand dollars with interest are entitled to be paid in priority to the bonds. It is found that the New Liverpool Salt Company recovered judgment against the California Development Company, as already stated, that the docket of said judgment was filed with the county recorder of Imperial County on the twentieth day of May, 1908, and ever since has been a lien on the real property of the California Development Company in Imperial County, prior to all other liens except the lien of the plaintiff's deed of trust. The New Liverpool Salt Company, it is found, instituted an action on January 26, 1911, whereby it attacked certain transfers of personal property made by the California Development Company to the Southern Pacific Company in March, 1908. The complaint in said action, finds the court, constituted a creditors' bill and vested in the New Liverpool Salt Company an equitable lien upon said property, which included 11,995 shares of the capital stock of the Mexican company. There is a like finding as to the effect of the cross-complaint filed by the New Liverpool Salt Company in this action on May 10, 1911. The court finds the facts which we have already stated with respect to the organization of the California Development Company and the discovery that it would be necessary to conduct water through Mexican territory, and finds, further, that in taking an option from Andrade the organizers of the company intended to transfer the option to the California Development Company and have such company take title to the lands. It was the plan, the court finds, that the California Development Company should own the entire canal system both in the United States and in the republic of Mexico, and should operate the same as a single and indissoluble system. The obstacles arising from the law of Mexico and the inability to surmount these obstacles by a concession authorizing the California Development Company to take the legal title to the Mexican lands are then recounted, and the findings set forth the formation, as the result of these difficulties, of the Mexican company, its acquisition of the lands from Andrade and the disposition of the twelve thousand shares of the stock to the California

Development Company as already stated. The remaining five hundred shares of the stock of the Mexican company, it is found, were issued to Heffernan and Blaisdell, who were stockholders owning a large number of the shares of the California Development Company, and each of whom had advanced $250 to the California Development Company to pay the expenses of organizing the Mexican company. The Mexican company was organized for the benefit of the California Development Company and solely for the purpose of carrying on that part of the business of the California Development Company which was required to be conducted within the republic of Mexico. Heffernan and Blaisdell, finds the court, took and held their stock solely as trustees for the California Development Company. Any stock which other defendants may have acquired from them was so acquired with full knowledge of the terms upon which Heffernan and Blaisdell held it. The Mexican company has always held the title to all of its property merely as agent and trustee for the California Development Company, and the entire beneficial interest in all of said property has always been, and now is, vested in the California Development Company. The California Development Company at its own expense constructed the system of canals over the lands in Mexico. Such construction was commenced and carried through pursuant to a contract between the two companies, but the Mexican company, at the time said contract was entered into, had no independent existence, and was entirely controlled by the California Development Company and was a mere agent of it.

The court finds further that it was the plan, purpose, and intent of the California Development Company and all its organizers, officers, and stockholders, and of the Mexican company and its organizers and stockholders, that the system of canals should be a single and indissoluble system, and should be maintained and operated as an entirety. From the time the irrigation system was first operated, water has been conducted through the republic of Mexico by means of said canal system at the expense of the California Development Company, and the canal has at all times been operated as an entire system.

The findings go on to declare that in the execution of the deed of trust to plaintiff it was the intention of all parties thereto to subject all of the lands, water rights, and property

of every kind nominally owned by the Mexican company (but in truth held by it merely as agent and trustee of the California Development Company) to the lien of said deed of trust and to make all of said property security for the repayment of the bonds issued thereunder; that in equity and good conscience all of said property was thereby subjected to the lien of said deed of trust and was thereby made security for said bonds, and the said lien and charge bound said properties in the hands of the Mexican company and in the hands of all persons taking title thereto or to any part thereof with notice of said deed of trust. At all times after the twentieth day of June, 1905, the Southern Pacific Company had full notice and knowledge of the execution of said deed of trust and of its terms and provisions. On May 6, 1902, the Mexican company executed to plaintiff as further security for the bonds issued under the deed of trust a mortgage of all of its property. This instrument was ratified and approved by all of the stockholders of the Mexican company, including the California Development Company. The mortgage was not, however, registered in the republic of Mexico, and under the law of that republic a mortgage "has no legal effect whatever, except from the day and hour in which it is duly registered." The court finds, however, that the signing and delivery of said mortgage imposed an equitable lien upon the property nominally held by the Mexican company, in favor of the holders of the bonds issued under the deed of trust, and that the Southern Pacific Company had full notice and knowledge of the execution of such mortgage not later than October 1, 1909. The findings then go on to recite the facts already set forth regarding the cutting of the new intake in the bank of the Colorado River, the diversion of "practically the entire flow of said Colorado River through said cut," and the application of the California Development Company for a loan. The loan was made, the Southern Pacific Company requiring as a condition that the California Development Company enter into a certain contract with it. By the terms of this contract the loan was to be repaid in installments. The Southern Pacific Company was to "have three members on the California Development Company's board of directors," one of whom should be president and general manager of the California Development Company and its business. In addition to having the right of nominating

three members of the board, it was agreed that all members
of said board (seven in number) should be "acceptable, that
is, not objectionable, to the Southern Pacific Company." The
president so selected was to have the power to name the
Development Company's secretary, treasurer, attorney, super·
intendent, chief engineer and consulting engineer, the persons
so named, however, to be acceptable to two directors other than
those named by the Southern Pacific Company. As further
security for the loan the California Development Company
agreed to procure the pledge, by some of its stockholders, of
six thousand three hundred shares of its capital stock, to be
deposited with a trustee named by the Southern Pacific Com-
pany. The court finds that from and after the execution of
this contract, the Southern Pacific Company exercised com-
plete and absolute control and dominion over the California
Development Company and over the Mexican company. Epes
Randolph, an agent and employee of the Southern Pacific
Company, was immediately elected president of the Cali-
fornia Development Company and has continued to be such
president up to the present time, and said Southern Pacific
Company has dictated the election of the other directors of
said California Development Company. By virtue of the
power thus exercised over the affairs of the California Devel-
opment Company, the Southern Pacific Company became and
at all times since the twentieth day of June, 1905, "has been
trustee of all the rights and properties of the California
Development Company and was bound as such trustee to
administer and protect said properties in the interests of said
California Development Company and its creditors." The
findings declare that the Southern Pacific Company exercised
like control and dominion over the Mexican company and its
directors. Upon the execution of the contract of June 20,
1905, Randolph was made president of the Mexican com-
pany, which had three directors. The remaining two direc-
tors were at all times subservient to Randolph and obeyed his
wishes. The general engineer of said Mexican company was
appointed by Randolph, and during his incumbency he acted
on behalf and under the dominion and control of the South-
ern Pacific Company. It is further found that by reason of
the circumstances mentioned, the Southern Pacific Company
became and has remained trustee of all the properties of the
Mexican company, bound to administer and protect said

property "in the interest of said Mexican company and said California Development Company, and the creditors of said California Development Company."

On December 8, 1909, the Southern Pacific Company instituted an action against the Mexican company in the court of first instance at Mexicali, Lower California, republic of Mexico. Said suit contained two counts or causes of action, the first on an alleged guaranty by said Mexican company of the payment of nine hundred and fifty thousand dollars advanced to the development company, and the other to recover damages for injuries to the tracks and other property of the Southern Pacific Company, caused by the water escaping from the Colorado River in consequence of the negligent cutting of the banks of said river. On or about the 9th of December, 1909, the board of directors of the Mexican company, acting under the dominion and control of the Southern Pacific Company, caused the general manager of said Mexican company to confess judgment on the first count for the sum of nine hundred and fifty thousand dollars. Judgment was accordingly entered for said sum without any trial whatever. Thereafter said board of directors, still acting under the dominion and control of said Southern Pacific Company, entered into a pretended compromise on the second count and agreed that a judgment by confession should be entered on that count for six hundred and fifty thousand dollars, and judgment was so entered without any . trial whatsoever. It is found that the action in the Mexican court was brought and the confessions of judgment were obtained by the Southern Pacific Company for the fraudulent and illegal purpose of segregating and dismembering the irrigation system by obtaining title to that portion of the system lying in Mexico, and of rendering the portion of said system in the state of California of little value, so that no one other than said Southern Pacific Company would bid for or purchase it, and with the further fraudulent purpose and design of hindering, delaying and defrauding the creditors of the California Development Company.

In March, 1908, the Southern Pacific Company, acting through its agents in control of the California Development Company, caused a pretended transfer of various assets of said California Development Company to be executed to it. Among said assets was the interest of said California Devel-

opment Company in 11,995 shares of stock in the Mexican company, pledged to plaintiff by the deed of trust sued on herein. The pretended consideration for this transfer was a credit of twenty-nine thousand dollars, but the transfer, it is found, was in fact without any adequate or valuable consid- eration, and was made with the express purpose of hindering, delaying and defrauding the New Liverpool Salt Company.

On February 9, 1909, the Southern Pacific Company com- menced an action in the superior court of Los Angeles County against the California Development Company on various promissory notes aggregating $1,279,865.77 and upon certain implied contracts for the payment of money. In this action the Southern Pacific Company caused an attachment to be issued and levied on the eleventh day of January, 1909, on 11,995 shares of the capital stock of the Mexican company, such shares being the same shares which the Southern Pacific Company had theretofore caused to be transferred to itself. At time of the issuance and levy of the attachment the Southern Pacific Company claimed, and now claims, to be the owner of said shares. At that time the California Devel- opment Company was, to the knowledge of the Southern Pacific Company, largely indebted and wholly insolvent, and the action was commenced and the attachment issued and levied by the Southern Pacific Company for the purpose of fraudulently obtaining an advantage to itself in the payment of its claims over other creditors of the California Develop- ment Company and for the purpose and intent of hindering, delaying and defrauding such other creditors, particularly the New Liverpool Salt Company. For the purpose of obtaining such attachment, the Southern Pacific Company caused to be filed in said action an affidavit, wherein it was set forth that the payment of the claim sued upon was not secured by any mortgage upon real or personal property or any pledge of personal property, and that the attachment was not sought and the action not prosecuted to hinder, delay or defraud any creditor of the California Development Com- pany. Said affidavit was false and untrue in this, that said attachment was sought and said action prosecuted to hinder and delay and defraud other creditors, and that the contracts sued upon were not unsecured, but were secured by certain choses in action which the Southern Pacific Company had caused to be transferred to itself as such security. Judgment

was entered in said action in favor of the Southern Pacific Company, and against the California Development Company on December 30, 1909, for $1,279,865.77. The findings then go on to recite the commencement by the New Liverpool Salt Company on January 26, 1911, of an action and the filing by said salt company on the 10th of May, 1911, of a cross-complaint in this action, which proceedings assailed the validity of the alleged transfer of the shares of stock in the Mexican company to the Southern Pacific Company. These are the proceedings which, in the view of the court, constituted creditors' bills, and created equitable liens in favor of the salt company. It is found that at no time prior to the 14th of August, 1911, and not until the ·offering of all the testimony bearing upon the fraudulent character of the conveyance of the shares of stock, has the Southern Pacific Company asserted any lien against said shares by reason of said attachment. It asserted such lien for the first time by its supplemental answer filed on said fourteenth day of October, 1911. The court finds that there was an unreasonable delay between the entry of the judgment obtained by the Southern Pacific Company on December 30, 1909, and the fourteenth day of October, 1911, and that it would be against equity and good conscience to permit the Southern Pacific Company to derive any advantage from said attachment against any of the creditors of the California Development Company.

The findings contain elaborate statements designed to set forth the formation by the Southern Pacific Company of a plan to defeat the judgment of the New Liverpool Salt Company, and to defraud the holders of the bonds issued under the deed of trust, by causing this action to be brought, having a receiver appointed, procuring the issuance of receiver's certificates to be acquired by said Southern Pacific Company, and by securing title to the property in Mexico through judgments obtained in the courts of Mexico. It is not thought necessary to refer to these matters in greater detail. It is found that the irrigation system is, and necessarily must be, a single and indissoluble system, that its value would be practically destroyed by segregating the portion lying in California, that neither part can be operated without the other, and that the segregation of said system by separating the ownership or control of the Mexican part from the part lying within the United States would result in great and inestimable

loss to the people of the United States. There is a large amount of personal property in the hands of the receiver which is of great value in connection with said irrigation system and necessary to its operation, but which would be of little value if sold separately. The court finds that it is essential to the preservation of the rights of the development company and the various lienholders, and for the public interest, that the system should be sold as an entirety, and that the best and most practical way to make such sale is to sell at one sale and as one property the stock of the Mexican company and of the New Mexican company, together with that part of the system lying within the United States, such sale to be free from any right of redemption.

The findings cover a number of matters in addition to those which we have set forth, but we have, we think, stated as much as is necessary to an understanding of the essential points presented by the appeals before us.

Upon the facts found the court made its judgment or decree in which it adjudged that plaintiff recover judgment against the California Development Company for $634,211, the principal and accrued interest due on the outstanding bonds, and that plaintiff has a first lien for the amount of said judgment; that New Liverpool Salt Company has a lien subject to that of plaintiff for the amount of its judgment of $458,246.23, with interest; that the Southern Pacific Company has a lien subject to that of the plaintiff and of the salt company for $1,501,903.63, the amount of the judgment (with interest), recovered by it against the California Development Company in the superior court of Los Angeles on December 30, 1909; that the property described in the decree be sold in one parcel without right of redemption, the proceeds to be applied after satisfying the costs and expenses of the proceedings, first to repay Heffernan and Blaisdell or their assigns the amount advanced by them for the five hundred shares of stock of the Mexican company originally issued to them, i. e., one dollar per share; next the amount due on receiver's certificates, next the amount due on plaintiff's judgment, next the amount due New Liverpool Salt Company under its judgment, next the amount due Southern Pacific Company under its judgment, and finally the surplus, if any, to the California Development Company. The foregoing statement is not precisely accurate with respect to the priority accorded to the

receiver's certificates.   Before the trial of this action the
New Liverpool Salt Company had appealed from the order
appointing the receiver and this order had been reversed, so
far as the salt company was concerned.   (*Title Insurance &
Trust Co.* v. *California Development Co.,* 164 Cal. 58, [127
Pac. 502].)   The result of this reversal was that the final
decree gave to the salt company priority, to a limited extent,
over the holders of receiver's certificates and bonds.   These
details are not, however, material to the present appeals, and
our statement of the terms of the decree will suffice for all
the purposes of this discussion.

The decree further provides that the property is to be sold
as an entirety without any right of redemption, and orders
the Southern Pacific Company to turn over to the commis-
sioner appointed to conduct the sale all of the stock of the
Mexican company, properly indorsed, and enjoins the South-
ern Pacific Company and the New Mexican company from
asserting any claim of ownership to the property which had
stood in the name of the Mexican company on January 28,
1911, or from transferring such property.   It further enjoins
the Southern Pacific Company from claiming any property
of the Mexican company under the execution sale made in
Mexico on January 28, 1911, or from doing any act or thing
for the completion of said pretended sale to the New Mexican
company, or for the enforcement of any judgment or claim
by the Southern Pacific Company against the Mexican com-
pany.   The Southern Pacific Company is also enjoined from
taking or prosecuting any proceeding or action in any Mexi-
can court for the enforcement of its judgments against the
Mexican company.   It also adjudges that the transfer by the
California Development Company to the Southern Pacific
Company of 11,995 shares of the stock of the Mexican com-
pany is void, and that the shares of the Mexican company
held by Heffernan and others are held by them as trustees
for the California Development Company.   It directs said
Heffernan and others to indorse and turn over said shares to
the commissioner upon payment to them of one dollar per
share with interest.   Finally, the decree describes the prop-
erty ordered to be sold.   The description covers in detail all
real property owned by the California Development Company
in the state of California, including its water rights, canals,
works and equipment, the entire capital stock of both Mexican

companies, and the personal property used in the maintenance or operation of the irrigation system. Some of the general language of the description might seem to cover the physical property, real and personal, situated in the republic of Mexico, but an examination of the findings, viewed as a whole, makes it quite clear that the court did not intend to undertake to direct a sale of tangible property located beyond the jurisdiction of the court. The decree was designed to effect a sale of the real and personal property in the state of California and of the shares of stock in the two Mexican corporations—not to sell any interest in the properties in Mexico, except as such properties might be affected by a sale and transfer of the shares of stock of the corporations owning the legal title to such properties. Apparently the court, in framing its conclusions of law and its decree, inadvertently used language that was too broad. The resultant defect in the description of the property to be sold by the commissioner may readily be cured by a modification of the judgment. To this we shall advert hereafter.

The appeals now before us are taken by the Southern Pacific Company and the New Mexican company. Each of these parties appeals from the judgment, from an order denying its motion for a new trial, and from an order denying its motion to vacate the judgment and enter another and different judgment. The plaintiff and the New Liverpool Salt Company interposed preliminary objections to the consideration of any of these appeals on their merits. First to be noted is the claim that this court has no jurisdiction of the appeals from the judgment, for the reason that the notice of appeal, in each instance, was directed to some but not all of the adverse parties. The same point was presented to us in answer to the applications of the present appellants for a writ of *supersedeas*. In disposing of those applications (*Southern Pacific Co.* v. *Superior Court*, 167 Cal. 250, [139 Pac. 69]), we held that where a notice of appeal was filed within the time limited by the "new and alternative method of appeal" provided by section 941b of the Code of Civil Procedure, the failure to address the notice to all of the adverse parties, or any of them, did not affect the validity of the appeal. The respondents ask us to reconsider that decision, but we see no reason for receding from the position heretofore taken.

The right of this court to review the orders denying motions for a new trial, or the orders denying motions to enter a different judgment, is questioned on the ground of the failure of the moving parties to serve their respective motions on some of the adverse parties. So, too, there was a failure to serve the bill of exceptions on such adverse parties, and this failure, it is urged, furnishes an independent ground for affirming the orders denying a new trial, and also requires us to refuse consideration to the bill of exceptions as a part of the record on the appeals from the judgment. As we do not desire to add to the already great length of this opinion by giving elaborate discussion to mere questions of practice, we shall limit ourselves to a mere outline of the conclusions reached. In the absence of service on the adverse party of notice of intention to move for a new trial, the lower court has no authority to grant such motion. (*Herriman* v. *Menzies,* 115 Cal. 16, [56 Am. St. Rep. 82, 35 L. R. A. 318, 44 Pac. 660, 46 Pac. 730] ; *United States* v. *Crooks,* 116 Cal. 43, [47 Pac. 870].) An "adverse party" is one whose "interest in the subject matter of the motion is adverse to or will be affected by the granting of the motion or changing the former decision of the court." (Id.) The notice in this case was not addressed to or served upon the California Development Company, or upon Heffernan, Flores, Rockwood, or Perry. They were, beyond a doubt, adverse parties, and the court could not, without service of notice upon them, grant a new trial of any issue affecting their interests. Their voluntary appearance and consent to the hearing of the motions, given months after the expiration of the time to serve notice of intention, could not cure the defect. The court itself had no authority to relieve the moving parties from the consequences of their failure to serve notice in time. (*Union Coll. Co.* v. *Oliver,* 162 Cal. 755, [124 Pac. 435].) This because its jurisdiction of the motion depended on timely service and filing of the notice. Since, then, jurisdiction of the subject matter depended on the service, it could not be conferred by waiver or consent. (*Bell* v. *San Francisco Sav. Union,* 153 Cal. 64, [94 Pac. 225].) It may be that the motions for new trial could have been entertained for the limited purpose of considering the right of the moving parties to a re-examination of issues not affecting the interests of the parties not served. These issues are the ones bearing on the relative priorities of

the appellants and the New Liverpool Salt Company. We shall not go into this matter, since the points that would be available on such inquiry arise on the appeals from the judgment, and can, as will appear in the disposition of those appeals, be given full effect without the necessity of a new trial.

The motions to enter a different judgment stand upon the same ground as the motions for new trial. In so far as they can be considered, the rights of appellants are fully protected by the appeals from the judgment.

Finally, the respondents urge that the bill of exceptions is not to be considered on the appeals from the judgment. The proposed bill was not served on the development company, or on Heffernan and those in like interest with him. As in the case of the motions for new trial, there was a waiver and consent of these parties when objection to the settlement of the bill was made. In any event the bill of exceptions, even though not served upon certain adverse parties, may be considered and the judgment modified in so far as such modification may be ordered without impairing the rights of the parties not served. (*Williams* v. *Santa Clara Min. Assn.,* 66 Cal. 193, [5 Pac. 85]; *Estate of Young,* 149 Cal. 173, [85 Pac. 145].) In the present case, the relative claims to priority of the Southern Pacific Company and the New Liverpool Salt Company may be determined without in the least degree affecting the rights of the California Development Company or of Heffernan, Flores, Rockwood, or Perry. And, of course, such points as appear on the judgment-roll itself can be considered, irrespective of the parties who may be affected.

But, beyond all this, we think the appellants are entitled to have their bill of exceptions considered as against all the respondents. Opposition to the settlement of a bill of exceptions for failure of timely service is a "proceeding against a party," and the trial court may relieve the defaulting party under section 473 of the Code of Civil Procedure. (*Stonesifer* v. *Kilburn,* 94 Cal. 33, [29 Pac. 332]; *Pollitz* v. *Wickersham,* 150 Cal. 238, [88 Pac. 911].) Evidently, therefore, the jurisdiction of the subject matter does not depend on prompt service, as it does in the case of a notice of intention to move for new trial. We conclude that the delay in service may be cured by the voluntary consent and waiver of the parties not served. The fact of waiver is not stated

in the main bill, but is made to appear in a supplemental bill of exceptions. Such supplemental bill could probably not be regarded on the appeals from the orders denying a new trial, since such orders, unless the motions be made on affidavits or the minutes of the court, must be reviewed on the statement or bill of exceptions which was before the lower court when it passed on the motions. (Code Civ. Proc., sec. 661.) But on an appeal from a judgment, the record includes "any bill of exceptions . . . in the case upon which the appellant relies." (Code Civ. Proc., sec. '950.) We think, therefore, that the supplemental bill, and consequently, the main bill of exceptions, are properly before us on the appeals from the judgment. The court is not disposed to give too strict an interpretation to technical rules of practice, when such interpretation is urged for the purpose of preventing a consideration upon the merits of appeals prosecuted in good faith.

The interest of the appellant, New Mexican company, in the present appeals will require little, if any, separate consideration. The material points may be given adequate examination and disposition by treating the case as if the Southern Pacific Company were the sole appellant. So, too, there is no occasion to deal separately with the position of Boaz Duncan, intervener and respondent. His interest is that of a holder of bonds, and his status may therefore be regarded as identical with that of the plaintiff, which instituted the action as trustee for all holders of bonds. The litigation, so far as the present appeals are concerned, narrows itself down to a three-cornered dispute, the contending parties being the bondholders, the New Liverpool Salt Company, and the Southern Pacific Company.

The effect of the decree was to give to the bondholders, represented by the plaintiff, a lien prior to the claims of both the salt company and the Southern Pacific Company, on all of the properties of the California Development Company in California and upon the shares of stock of the Mexican company and the New Mexican company representing the beneficial ownership of the properties in Mexico. While the New Liverpool Salt Company, in its pleadings, asserted priority over the bondholders, it is not now complaining of the decree and in effect concedes that the bondholders are entitled to priority over it. The Southern Pacific Company, however, attacks the propriety of the decree in so far as it gives to the

plaintiff a prior lien upon any property other than that in the state of California.

The New Liverpool Salt Company is given a lien upon all of the property of the California Development Company, including the physical properties in California as well as the shares of stock in the two Mexican corporations, and this lien is made prior to the lien of the Southern Pacific Company for the amount found to be due under its judgment recovered in the superior court of Los Angeles against the California Development Company. The Southern Pacific Company attacks this feature of the decree also, asserting that the New Liverpool Salt Company is entitled, at most, to priority with respect to the real property of the California Development Company within the state of California. The various questions involved may best be treated by separating the discussion into two branches. The first of these will deal with the attack made by the appellants on the judgment in favor of the plaintiff as trustee for the bondholders. Some of the points to be discussed in this connection will also bear upon the disposition of the second branch, which has to do with the relative rights of the Southern Pacific Company and the New Liverpool Salt Company.

We come, then, to the propriety of the judgment in favor of the plaintiff. In this connection we assume, as has already been indicated, that the bill of exceptions is properly before us, and that the sufficiency of the evidence to sustain the various findings of fact may be examined.

Lying at the very base of the controversy, and first to be decided, is the validity of the claim of the appellants that the decree attempts to adjudicate interests in property situated beyond the territorial jurisdiction, and that the courts of this state are without power to make such adjudication. That the courts of California cannot make a decree which will operate to change the title to real or personal property beyond the territorial limits of this state is conceded on all hands. But, as we have already suggested in stating the terms of the decree, the court did not undertake to do this. What it did was to direct a sale of the property in California and of the *shares of stock* in the Mexican corporations held by persons who were within this state and who had been made parties to the action and brought under the jurisdiction of the court. It is true that, in order to make its sale of this stock effective,

the court undertook, by a decree operating upon the Southern Pacific Company and the two Mexican companies, to control the action of these parties with reference to the Mexican lands and to the properties. That a court of equity, having acquired jurisdiction of certain parties, may, by a decree operating on them *in personam*, control their actions with regard to properties situated without the jurisdiction, when such action is necessary for a complete disposition of the controversy before the court, is thoroughly well settled. In *Toller* v. *Carteret*, 2 Vern. 494, this principle was applied to a suit brought to require the defendant to redeem from a mortgage on lands beyond the jurisdiction, or be foreclosed. So, in *Penn* v. *Lord Baltimore*, 1 Ves. Sr. 444, the Lord Chancellor entertained a bill for specific performance of a contract entered into in England to determine the boundary between the provinces of Pennsylvania and Maryland. In *Massie* v. *Watts*, 6 Cranch, 148, [3 L. Ed. 181], the supreme court of the United States upheld an action brought in the circuit court for the district of Kentucky to compel the defendant to convey to the plaintiff a tract of land in the state of Ohio and beyond the territorial jurisdiction of the court in which the action was instituted. More directly analogous to the case at bar is the line of decisions sustaining the power of a court of equity to foreclose a mortgage upon a single piece of property, such as a railway or canal, lying partly within and partly without the jurisdiction of the court. (*McElrath* v. *Pittsburg etc. R. R. Co.*, 55 Pa. St. 189; *Brown* v. *Chesapeake & O. Canal Co.*, 73 Md. 567; *Muller* v. *Dows*, 94 U. S. 444, [24 L. Ed. 207]; *International Bridge and Tramway Co.* v. *Holland Trust Co.*, 81 Fed. 422, [26 C. C. A. 469].) In *Muller* v. *Dows*, an action was brought in the circuit court for the district of Iowa to foreclose a mortgage or deed of trust on a railway lying partly in Iowa and partly in Missouri. The decree ordered a sale of the entire property, and directed the owners to make a deed conveying the property to the purchaser. The decree was affirmed. Speaking of the objection that the decree was void "so far as it directed the usual foreclosure and sale of property not within the territorial jurisdiction of the court," the supreme court said: "If such a foreclosure and sale cannot be made of a railroad which crosses a state line and is within two states, when the entire line is subject to one mortgage, it is certainly to be regretted,

and to hold that it cannot be would be disastrous, not only to the companies that own the road, but to the holders of bonds secured by the mortgage. . . . If the railroad, under legal process, can be sold only in fragments; if, as in this case, where the mortgage is upon the whole line, and includes the franchises of the corporation which made the mortgage, the decree of foreclosure and sale can reach only that part of the road which is within the state, it is plain that the property must be comparatively worthless at the sale. . . . In view of this, before we can set aside the decree which was made, it ought to be made clearly to appear beyond the power of the court. Without reference to the English chancery decisions, where this objection to the decree would be quite untenable, we think the power of courts of chancery in this country is sufficient to authorize such a decree as was here made. It is here undoubtedly a recognized doctrine that a court of equity, sitting in a state and having jurisdiction of the person, may decree a conveyance by him of land in another state, and may enforce the decree by process against the defendant. True, it cannot send its process into that other state, nor can it deliver possession of land in another jurisdiction, but it can command and enforce a transfer of the title." This court itself has, in *Smith* v. *Davis,* 90 Cal. 25, [25 Am. St. Rep. 92, 27 Pac. 26], an action brought to appoint a trustee and have the execution of a trust relating to lands lying in Washington decreed, recognized the rule declared in *Massie* v. *Watts,* 6 Cranch, 148, [3 L. Ed. 181], and similar cases, and upheld the jurisdiction upon the ground that the decree acts "primarily and properly *in personam* and at most collaterally only *in rem,*" adding that a "trust will be enforced pertaining to realty, regardless of the situation of the property." In the case at bar the court had before it all of the parties, and we do not, in view of the foregoing authorities and many others that might be cited, doubt its power to make a decree binding upon those parties with regard to the interests claimed by them in lands or other property beyond the territorial jurisdiction. This conclusion is not affected by the fact that the courts of Mexico had appointed a receiver of the Mexican properties. As we have said, the decree does not, by its own force, adjudicate the title to those properties, nor does it interfere with their possession.

The feature of the decree now under consideration is based upon the contentions, supported by the findings of the court

below, that the canal system running through the two countries was essentially a single and indivisible entity, and that it was the intention of all of the parties in interest to subject the entire system to the lien of the bonds to be issued under the deed of trust executed to the plaintiff. There is no occasion to review at any length the evidence regarding the unity of the system. The history of the enterprise, the physical and topographical conditions confronting its promoters, the means adopted for overcoming the difficulties arising from the Mexican laws, the manner in which the Mexican company was formed, the relation borne by it toward the California Development Company, the mode in which the canal was constructed and operated—all of these facts, which are shown without dispute by the record, fully sustain, if indeed they do not render inevitable, the conclusion that the parties intended, and that the physical situation required, that the canal system should be maintained and operated as a single unit.

It is equally free from doubt that the Title Insurance and Trust Company obtained an equitable lien upon all of the properties in Mexico owned by the Mexican company, as security for the bonds to be issued by the California Development Company. The deed of trust did not, to be sure, undertake to convey to the trustee the legal title to the Mexican properties. Obviously enough, the reason for this is to be found in the condition of the law of Mexico—the same consideration that led to the formation of the Mexican company to hold title to the properties in Mexico. But that the beneficial interest in those properties was to be subject to the lien of the deed of trust is very manifest. By that deed the California Development Company transferred to the plaintiff twelve thousand shares of the stock of the Mexican corporation, all of the stock, that is to say, standing in its name. The deed of trust contains further provisions indicating the purpose of the parties to make the Mexican properties security for the bonds. After making elaborate recitals regarding the formation of the Mexican company and the property owned by it, the deed authorizes the sale by the Mexican company at a certain minimum price, of lands and water rights not constituting a part of the main canal, and requires a given portion of the purchase price to be paid to the trustee

as a part of the sinking fund for the payment and redemption of the bonds and coupons to be issued. There are other provisions defining and limiting the power of the Mexican company to sell and convey its lands. Furthermore, the Mexican company itself, in 1902, made a mortgage of all of its lands and other properties to the plaintiff as security for the bonds. This instrument, which was ratified by the stockholders of the Mexican company, including the development company, was made for the avowed purpose of complying with a provision of the deed of trust requiring the grantor in that deed to give on demand further assurances, deeds, conveyances, etc., for the better securing of the bonds. The mortgage of 1902 was not effective under the laws of Mexico as a legal conveyance or charge, for the reason that it was not registered. It is, however, available as evidence of the intention of the parties, and this intention is the paramount factor in determining whether or not an equitable lien has been created. To this point the decisions, many of them in this state, are numerous and uniform. Professor Pomeroy (3 Pomeroy's Equity Jurisprudence, 3d ed., sec. 1235), states the rule thus: "Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice." This passage is quoted in *Walker* v. *Brown*, 165 U. S. 654, [41 L. Ed. 865, 17 Sup. Ct. Rep. 453], as condensing and stating "the general result of the authorities on the subject." In *Daggett* v. *Rankin*, 31 Cal. 321, this court said that "the doctrine seems to be well established that an agreement in writing to give a mortgage, or a mortgage defectively executed, or an imperfect attempt to create a mortgage, or to appropriate specific property to the discharge of a particular debt, will create a mortgage in equity, or a specific lien on the property so intended to be mortgaged." (See, also, *Love* v. *Sierra Nevada Min. Co.*, 32 Cal. 639, [91 Am. Dec. 602]; *Remington* v. *Higgins*, 54 Cal. 620; *Higgins*

v. *Manson,* 126 Cal. 467, [77 Am. St. Rep. 192, 58 Pac. 907] ; *Hall* v. *Cayot,* 141 Cal. 13, [74 Pac. 299].) The rule was reaffirmed in *Earle* v. *Sunnyside Land Co.,* 150 Cal. 214, [88 Pac. 920], where, in answer to the objection that a certain instrument purporting to be a conveyance in trust was not valid as a trust deed, we held that there could be ''no difficulty in sustaining the instrument as an equitable mortgage or lien.'' After laying down the general principle in language found in earlier decisions, the court said that ''in a case like this, where the parties have entered into a written agreement, of whatever form, intended to make certain property a security for past indebtedness and for future advances, and have acted upon the faith of that agreement in making and accepting such further advances, we should be slow to adopt any construction which would result in invalidating the entire transaction and depriving the creditor who has advanced his money in good faith of any remedy for its recovery. No policy of the law is violated by treating this instrument as creating a lien in the nature of a mortgage, if it cannot be upheld as a deed of trust.'' (See, also, *Beckwith* v. *Sheldon,* 168 Cal. 742, 746, [Ann. Cas. 1916A, 963, 145 Pac. 97].) The facts to which we have referred, in connection with the further fact, clearly established by the evidence, that the Mexican company was an agency of the California Development Company, created and operated to enable the development company to construct and operate its canal system as originally projected, leave no room for doubt that the parties intended to, and did, by the execution of the deed of trust and the subsequent mortgage, vest in the plaintiff an equitable lien upon the property in Mexico as security for the bonds. The Southern Pacific Company had notice of the existence of this lien before it acquired the interest claimed by it in the Mexican properties. It was therefore bound by the lien.

The foregoing considerations also justify the provisions of the decree directing the sale, as an entirety and without right of redemption, of all the property, real and personal, covered by the lien of the mortgage or deed of trust. The ground for supporting such sale is to be found in the essential unity of the system. Where there is a mortgage covering real and personal property, comprising parts of a single working plant or utility, in which each part is necessary to give value to the

others, and where a dismemberment of the system would destroy or greatly impair the usefulness or value of its component parts, the propriety of a decree like the one here made is well settled. The statute giving a right of redemption upon execution sales of real property is held to have no application to such cases. In *Hammock* v. *Loan & Trust Co.,* 105 U. S. 77, [26 L. Ed. 1111], this principle was applied to the foreclosure of a deed of trust covering the property, real and personal, including the franchises, of a railroad corporation.

The authorities do not support the claim of the appellants that the rule is applied only to sales of railroads. A sale as a whole, without right of redemption, has been ordered in a suit to foreclose a mortgage upon the property of a water company. (*Farmers' Loan & Trust Co.* v. *Iowa Water Co.,* 78 Fed. 881.) So where the property was that of a fishing and canning plant. (*Pacific Northwest Packing Co.* v. *Allen,* 116 Fed. 312, [54 C. C. A. 648].) A like provision, in a decree for the sale of an irrigation system, was upheld in *Continental & C. T. & S. Bank* v. *Corey Bros. Const. Co.,* 208 Fed. 976, [126 C. C. A. 64]. Nor is it true that the right to order such a sale will be exercised only where the property to be sold is that of a public service corporation. In the opinion of the supreme court of the United States in the Hammock case, the fact that the property involved was affected by a public interest was discussed at some length as one of the grounds for the conclusion reached, but the decision did not rest upon this consideration alone. As was said by the circuit court of appeals in *Columbia F. & T. Co.* v. *Kentucky Union Ry. Co.,* 60 Fed. 794 (802), [9 C. C. A. 264], "the controlling reasons which induced the decision in *Hammock* v. *Trust Co.* sprang from a consideration of the unity of the railroad property." Likewise in *Pacific Northwest Packing Co.* v. *Allen,* 116 Fed. 312, [54 C. C. A. 648], the court said that "the general doctrine applicable to this case is not confined solely to railway property, nor to cases where the general public is interested. . . . The true doctrine upon which the principles above stated are founded is that of necessity arising from the condition and character of the property mortgaged, although it is in several of the cases based upon the public or *quasi*-public character of the corporation whose property is to be sold." It is, therefore, of no consequence that, as this court held in *Thayer* v. *California Development Co.,* 164 Cal. 117,

[128 Pac. 21], the California Development Company was not engaged in the administration of "a public use" so far as the water appropriated by it for distribution in California was concerned. But even if the public interest were to be considered as having an important bearing on the question, it cannot be doubted that the interest of the public in the maintenance and operation of the irrigation system here involved was sufficiently clear and direct to justify the action of the court. The findings covered this point specifically, and we do not doubt that they have support in the evidence.

Pausing, for a moment, to survey the situation as developed by the discussion thus far, we see that plaintiff had a legal lien, prior to any claim of the Southern Pacific Company, upon all of the property of the California Development Company situated in the state of California; that it had a lien, equitable in character, upon all of the property of the Mexican company; that its rights as against the Mexican properties were fortified and re-enforced by a legal pledge of twelve thousand shares of the capital stock of the Mexican company. By the terms of the decree it is also given a lien upon the remaining five hundred shares of stock standing in the name of Heffernan, Blaisdell, and their assigns, subject to the right of the latter to be repaid the amounts advanced by Heffernan and Blaisdell upon the original issue of the stock. We have before us the further fact that the system, including both the Californian and the Mexican properties, formed a single and indivisible unit. These circumstances, under the principles heretofore outlined, justified the sale, as a whole, of the property in California together with the shares of stock representing the ownership of the Mexican properties. Meanwhile, however, the Southern Pacific Company had, by means of judgments obtained by it in the Mexican courts, procured a sale of all of the properties of the Mexican company to the New Mexican company, a corporation organized in the interest of the Southern Pacific Company and in fact owned and controlled by that company. If these proceedings are beyond the reach of a court of equity sitting in this state, and having jurisdiction of all of the parties, including the Southern Pacific Company and the two Mexican companies, the result is that the plaintiff's lien on the Mexican properties is in effect destroyed. It has its lien upon the stock in the Mexican company and may have a sale of that stock, through which

alone it can effectually reach the Mexican properties, but when it comes to realize on such sale, it finds that all of the tangible properties, which give value to the stock, have been taken from the corporation owning them, leaving to the pledgee and the bondholders whom it represents an empty right without substance or worth.   Can such result be brought about by a creditor who, having secured an actual control of the debtor, and with knowledge of the prior equitable lien of the bondholders, employs that control to have the property transferred to himself or his agent through the means of a collusive judgment?   The court has found that the facts are those just suggested.   It found that the Southern Pacific Company assumed and exercised complete control and dominion over both the California Development Company and the Mexican company; that with the purpose and intent of dismembering the system of the California Development Company and preferring its own claim to that of other creditors, including the bondholders, it brought its action in the Mexican courts against the Mexican company, and exercised its control over that company to the end of having the said Mexican company confess judgment.   The judgment so obtained was the foundation for the sale to the New Mexican company.   These findings are vigorously attacked by the appellants, but an examination of the record leaves no doubt of the sufficiency of the evidence to support them in every particular.   We need not go into details in considering the scope and effect of the agreement of June 20, 1905, between the Southern Pacific Company and the California Development Company. Even though such agreement was not legally enforceable, as was held in *Holt* v. *California Development Co.*, 161 Fed. 3, [88 C. C. A. 167], its terms were actually carried out by the parties, and the contract unquestionably resulted in placing the Southern Pacific Company in a position of effective domination of both the California Development Company and the Mexican company.   We are not here suggesting that the motive actuating the assumption of such control was, in and of itself, at all censurable.   The Southern Pacific Company was advancing large sums of money to a corporation in financial difficulties, and had good reason for desiring to so direct the affairs of the borrower as to secure the proper expenditure of the moneys advanced, and to make more likely their repayment.   But these considerations have no bearing on the

question whether in fact it did exercise dominion and control over the California Development Company and its subsidiary, the Mexican company, as alleged by the respondents and found by the court. Having such control and dominion over the development company and its subsidiary, the Southern Pacific Company occupied a fiduciary relation toward the California Development Company and its stockholders and creditors. We entertain no doubt of the soundness of the claim made by respondents that the Southern Pacific Company, by thus taking control of the directorate and the business of the development company, rendered itself subject, at least to the restrictions which are imposed upon a director of a corporation. It was a creditor of the development company, and it had seen fit to make its advances without exacting the security of any mortgage or lien upon the real or personal property of its debtor except the pledge of six thousand three hundred shares of the stock of the Mexican company. The court finds that on February 9, 1909, a date prior to the obtaining of the judgments in the Mexican courts, the California Development Company was insolvent, and that this fact was known to the Southern Pacific Company. The finding has the fullest support in the evidence. Randolph himself, who became president of the California Development Company pursuant to the contract of June 20, 1905, testified: "I made an examination of the affairs of the California Development Company immediately after my accession and found it to be hopelessly involved in debt. I found it absolutely insolvent." Directors and officers of a corporation occupy a relation to other creditors "demanding the utmost good faith on their part in the handling of the corporation assets. As managers of the corporation and its property, they owe a duty to those dealing with them, which they violate when, to the detriment of those who confide in them, they make themselves preferred beneficiaries in the disposition of assets which, without such preference, would be available alike to all creditors." (Kellam, J., in *Adams & Westlake Co.* v. *Deyette*, 8 S. D. 119, [59 Am. St. Rep. 751, 31 L. R. A. 497, 65 N. W. 471]; Clark and Marshall on Private Corporations, sec. 787b.) "Directors of an insolvent corporation who have claims against the company as creditors," says Mr. Morawetz (2 Morawetz on Corporations, 2d ed., sec. 787), "cannot secure to themselves any preference or advantage over other

creditors, by using their powers as directors for that purpose." (See, also, 2 Cook on Corporations, 6th ed., sec. 692; *Bonney* v. *Tilley*, 109 Cal. 346, [42 Pac. 439]; *Richards* v. *Insurance Co.*, 43 N. H. 263.) The rule is so firmly established that further citation of authority is unnecessary. As we have said, the Southern Pacific Company occupies in this case a situation analogous to that of a director of the California Development Company seeking to secure the payment of his own claim against that company. It exercised a power far wider than that which a single director usually has. In this position, being in complete control of the development company and the Mexican company, it sought to defeat the superior rights of the bondholders in the Mexican property, as well as the rights of other creditors, by the device of a collusive judgment against the Mexican company, and an execution sale under such judgment. In the action prosecuted in the Mexican court the Southern Pacific Company in reality occupied at the same time the positions of plaintiff and defendant. It brought the action and by means of its power of control over the directors of the Mexican company it caused that company to confess judgment. Of the evidence regarding the character of the Mexican judgment we need say no more than to refer to a letter written by the attorney having charge of the interests of the Southern Pacific Company. In this letter, which was written to the auditor of the Southern Pacific Company, the following passage occurs: "The judgment in Mexico was obtained on the pleadings, the Mexican company acting unquestionably under the dominion of the Southern Pacific Company, and having confessed judgment for the $950,000." Referring to the six hundred and fifty thousand dollar judgment, the writer in the same letter said: "It was entered without the knowledge of the stockholders or creditors of the California Development Company and is unquestionably subject to attack as collusive." It needs no argument to demonstrate that it would be to the last degree inequitable to permit the appellant to profit by the judgments thus obtained by it.

Notwithstanding various technical objections urged by the appellants, we are of the opinion that the court below was authorized to go behind these proceedings and compel the parties seeking to benefit by them to make an equitable application of the assets which they had improperly acquired. It

is argued that the courts of Mexico alone could adjudicate with reference to the title to the Mexican properties. But, as we have heretofore pointed out, the decree does not undertake to determine the title to those properties. It recognizes that the legal title, originally in the Mexican company, has now passed to the New Mexican company. But, having jurisdiction of all the parties, the court acts upon them *in personam*, and restrains them from using their legal rights in a manner which would be contrary to equity and good conscience. Similar considerations answer the contention that the decree undertakes to overturn the judgment of a foreign court, thus violating, as is claimed, the provisions of section 1915 of the Code of Civil Procedure. That section declares that ''a final judgment of any . . . tribunal of a foreign country having jurisdiction, according to the laws of such country, to pronounce the judgment, shall have the same effect as in the country where rendered, and also the same effect as final judgments rendered in this state.'' There is no allegation or proof that a judgment in Mexico has any greater force than a judgment in this state. All that the court was required to do, therefore, was to give to the Mexican judgments the same force to which a California judgment would have been entitled. It is elementary that the courts of this state may in an equitable proceeding inquire whether a judgment valid on its face was obtained by fraud. Sometimes such judgments may be set aside, but even in cases where this relief cannot be had a court of equity may ''prevent an inequitable advantage being taken of it (the judgment) by adjudging the guilty beneficiary or his successor with notice a trustee for the defrauded party.'' (*Campbell-Kawannanakoa* v. *Campbell*, 152 Cal. 201, 208, [92 Pac. 184, 187] ; *Estate of Walker*, 160 Cal. 547, [36 L. R. A. (N. S.) 89, 117 Pac. 510].) In the Walker case it was held that where an estate had been administered on the theory of the decedent's intestacy, and the decree of distribution had become final, a court of equity might declare the distributees to be involuntary trustees for the beneficiaries under a will which, through accident, fraud, or mistake, had not been presented in the original probate proceeding. While there was some difference of opinion regarding the procedure to be followed in the particular matter before the court, all of the justices were agreed upon the proposition just stated. (See,

also, *Bacon* v. *Bacon,* 150 Cal. 477, [89 Pac. 317].)   The decree here complained of controls the action of beneficiaries of the Mexican judgments in the manner authorized by the rule of law to which we have just adverted.

Nor does the decree appealed from violate section 3423 of the Civil Code.   The first subdivision of that section is the only one having any relevancy here.   It declares that an "injunction cannot be granted: First.   To stay a judicial proceeding pending at the commencement of the action in which the injunction is demanded, unless such restraint is necessary to prevent a multiplicity of such proceedings."   The only judicial proceeding pending in the Mexican courts at the commencement of this action was the suit which resulted in the two judgments for nine hundred and fifty thousand dollars and six hundred and fifty thousand dollars, respectively. The decree before us does not undertake to "stay" that proceeding.   It merely enjoins the inequitable use of the judgments which are the result of that proceeding.   As was said by Justice McFarland, in his concurring opinion in *Wright* v. *Superior Court,* 139 Cal. 469, 476, [73 Pac. 145], "Section 3423 can hardly be said to be applicable where the action or proceeding has terminated in a final judgment."   Unless this were so, the recognized right of the courts of this state to enjoin the inequitable use of judgments would be greatly restricted.

There is no force in the claim that the Mexican judgments cannot be attacked as fraudulent, without a showing that the claims upon which those judgments were rendered were not meritorious.   Ordinarily, to be sure, one who seeks to complain in equity of a judgment obtained against him by fraud may not have the judgment set aside without showing that he had a meritorious defense to the claim upon which the judgment was given.   But the fraud here complained of is not that a judgment founded on an unjust demand was rendered against the Mexican company.   It is that the Southern Pacific Company occupied a fiduciary relation to the plaintiff and other creditors of the California Development Company which made it inequitable for the Southern Pacific Company to use its position of control over the Mexican company so as to destroy the equal or prior rights of the other creditors.   The execution sale upon the judgment obtained by confession cannot, under the scrutiny of a court of equity, occupy

any different position from that of a voluntary transfer by the Mexican company to the Southern Pacific Company. (*Atwater* v. *American Exch. Bk.*, 152 Ill. 608, [38 N. E. 1017] ; *Hill* v. *Pioneer Lumber Co.*, 113 N. C. 173, [37 Am. St. Rep. 621, 21 L. R. A. 560, 18 S. E. 107].) In view of the relation of the parties to each other and to the property involved, such transfer could not have withstood an attack by the bondholders or other creditors. An execution sale under a consent judgment, where the consent is, in effect, not the act of the defendant but that of the plaintiff prosecuting the action, is in reality merely a voluntary transfer. To give it any better standing would be the grossest sacrifice of substance to form.

The appellants contend that the court was without jurisdiction to adjudicate with reference to the validity of the title of the New Mexican company, claimed by virtue of the execution sale, for the reason that the claim of the New Mexican company is adverse to the title of both the California Development Company and the plaintiff herein, and that such adverse title cannot be adjudicated in a foreclosure suit. The general rule relied upon is stated in *Cady* v. *Purser*, 131 Cal. 552, at page 559, [82 Am. St. Rep. 391, 63 Pac. 844], in these words: "The principle is well settled that paramount and adverse titles are not proper subjects for adjudication in actions for the foreclosure of a mortgage." We think, however, that the rule is not applicable to the situation disclosed by the record before us. It is true that the New Mexican company claims under the Mexican company, and not under the California Development Company, the mortgagor in the mortgage here sought to be foreclosed. But the supplemental pleadings allege, and the court finds, that the Mexican company was in truth, a mere subsidiary and agency of the development company, and that the properties standing in its name were made a part of the security for the bonds. The issues presented to the court involved the right of the bondholders to realize upon all of the security, including the Mexican properties, upon which they claimed an equitable lien. If the lien existed, it bound the Mexican company and every subsequent purchaser with notice. Such a purchaser could not, by disputing the facts upon which the lien was claimed, deprive the court of authority to determine whether there was such a lien, and whether the purchaser took with notice

of it.   Again, the court had the right to look through the
form of the corporate organizations and holdings, and to find
that, in substance and fact, the development company was
the real owner of the Mexican properties, holding and operat-
ing them through the medium of its creature, the Mexican
company.   In this aspect the title claimed by the appellants
was derived from the development company, the mortgagor.
An additional answer to the contention under consideration
is that the court is not precluded from considering adverse
claims in a foreclosure suit, where it is charged that the
alleged adverse claim was acquired fraudulently for the pur-
pose of defeating the rights of the mortgagee.   (*Wilkinson*
v. *Green,* 24 Mich. 221.   See, also, Jones on Mortgages, sec.
1440.)

On similar grounds the appellants urge that the court could
not, in this action, adjudicate the rights of Heffernan and
Blaisdell to the five hundred shares of stock standing in their
names.   This stock, it will be remembered, was found by the
court to be held in trust for the California Development Com-
pany, and to be in equity subject to the lien of the mortgage,
although not transferred by the deed of trust.   What we
have just said with reference to the claim of the New Mexican
company is a sufficient answer to the point raised in this be-
half.   But if the court committed an error or exceeded its
power in attempting to determine the ownership to this stock,
it would seem that the only parties concerned are Heffernan
and Blaisdell, or their assigns, who claimed to be the owners
of the stock.   The appeal of these parties has, however, been
dismissed and the judgment is final so far as they are con-
cerned.   The Southern Pacific Company and the New Mexi-
can company are in no position to claim that the rights of
Heffernan and Blaisdell have been injuriously affected.

With the exception of one or two minor matters which will
receive brief mention hereafter, the preceding discussion dis-
poses of the various grounds upon which the judgment in
favor of the plaintiff is attacked.   There remains for con-
sideration that portion of the decree which fixes the relative
rights and priorities of the New Liverpool Salt Company and
the Southern Pacific Company.

The New Liverpool Salt Company secured its judgment on
January 10, 1908.   A transcript of the docket of said judg-
ment was filed in Imperial County on May 20, 1908, and the

judgment thereupon became a lien upon all the real property in that county, owned by the judgment debtor, California Development Company. This lien is clearly and confessedly prior and superior to any claim of the Southern Pacific Company. The substantial controversy between these two parties is over their respective priorities with reference to the properties in Mexico, or, rather, the shares of stock representing the beneficial ownership of those properties. The New Liverpool Salt Company claims a lien upon these shares of stock (or, rather, 11,995 of them), by virtue of the institution by it on January 26, 1911, of an action and the filing by it on May 10, 1911, of a cross-complaint in this action. The court found that these pleadings constituted creditor's bills and created an equitable lien upon the debtor's properties therein described. The soundness of this conclusion is fully supported by the authorities. (*Seymour* v. *McAvoy,* 121 Cal. 438, [41 L. R. A. 544, 53 Pac. 946] ; *Chittenden* v. *Brewster,* 2 Wall. 191, [17 L. Ed. 839, 20 Cyc. 826].) The real question is whether the Southern Pacific Company acquired title to or a lien upon the property prior to the time when the salt company's equitable lien came into existence. The Southern Pacific Company relies, first, upon a transfer to it in March, 1908, of various assets of the California Development Company, including the title of the development company (subject to the lien of plaintiff's pledge) in and to 11,995 shares of stock of the Mexican company. This transfer the court finds to have been void as against the New Liverpool Salt Company, because made with the purpose of hindering, delaying and defrauding said salt company. The sufficiency of the evidence to support this finding appears very plainly from an examination of the record. The transfer took place the day before the New Liverpool Salt Company obtained its judgment. We need not repeat what we have already said touching the control exercised by the Southern Pacific Company over the California Development Company. Randolph, who represented the Southern Pacific Company in the management of the development company, testified that he tried "to conserve the assets to keep some other creditor from jumping on them—the salt works for instance." He further stated that one of the purposes governing his general course of conduct was "to defeat the judgment of the New Liverpool Salt Company," and that he had used his power

"to the fullest extent to accomplish that purpose." The letter from the Southern Pacific Company's counsel to its auditor, hereinbefore referred to, states in plain terms that when fear was entertained that judgment would be rendered in favor of the salt company, the assignment was made "in order to preclude the salt company from satisfying its judgment out of assets which had been conserved or obtained by means of resources furnished by the Southern Pacific Company." A transfer made with intent to delay or defraud any creditor of his demands is void against all creditors of the debtor. (Civ. Code, sec. 3439.) "The question of fraudulent intent is one of fact and not of law." (Civ. Code, sec. 3442.) If that intent is made out, it is not necessary to show that the debtor was insolvent at the time. (*First Nat. Bk.* v. *Maxwell,* 123 Cal. 371, 373, [69 Am. St. Rep. 64, 55 Pac. 980].) The right of the New Liverpool Salt Company to avoid the transfer for fraud was too clearly established to require any further discussion.

The next claim of the Southern Pacific to a lien upon the shares of stock in the Mexican company is based upon the attachment levied on 11,995 shares of that stock in the action begun by the Southern Pacific Company against the California Development Company in the superior court of Los Angeles County. This action was instituted on January 9, 1909, and the attachment was levied two days later. This was prior in time to the acquisition of any lien upon this stock by the New Liverpool Salt Company. If the attachment lien was valid, the Southern Pacific Company acquired an interest superior to that of the salt company, and is entitled to have the proceeds of the sale of these 11,995 shares of stock applied to the payment of its claim in preference to that of the salt company. Before the entry of the decree in the present case, the action in which that attachment was levied had gone to judgment, and the judgment in favor of the Southern Pacific Company had become final. The validity of that judgment is not here open to question, nor is it in fact attacked. The court below recognized its binding force by its decree.

Various attacks on the claim under the attachment were made by the salt company and were sustained by the court below. It is claimed, in the first place, that the fiduciary relation occupied by the Southern Pacific Company toward

the California Development Company, the same relation which, as we have held, precluded it from defeating the claims of other creditors by procuring the property of the debtor to be transferred to it through the form either of voluntary transfers or of consent judgments, operated to destroy its right to claim a lien by attachment. But this view, we think, is based upon an erroneous conception of the law. In speaking of the proceedings taken in Mexico we have likened the position of the Southern Pacific Company to that of a director of a corporation. The director who is at the same time a creditor is precluded from using his position as director to obtain a preference over other creditors in the payment of his own claims. Mr. Morawetz, after laying down the rule in section 787 of his work, already cited by us, goes on to say: "It is to be observed, however, that a person who is a creditor of an insolvent corporation is not deprived of any of his rights as a creditor by the fact that he also occupies the position of director of the company. He is merely incapacitated as director from using any of the powers of his position for his own benefit or the benefit of his codirectors." This passage, with the preceding portion of section 787 of Mr. Morawetz' work, is quoted with approval by this court in *Bonney* v. *Tilley,* 109 Cal. 346, at page 351, [42 Pac. 439]. The same principle was declared in *Nebraska Nat. Bank* v. *Clark,* 58 Neb. 183, [78 N. W. 527]. The purport of the opinion in this case is fairly stated in the syllabus, which reads as follows: "A director of an insolvent corporation may not through any advantage gained by reason of, or which may be taken of, his directorship obtain or secure a preference of debts of the corporation to him or in which he is materially interested, but a judgment for such debt secured without any such advantage will be upheld even though it may work a preference of the debt." (See, also, *Marr* v. *Marr,* 72 N. J. Eq. 797, [66 Atl. 182].) And this distinction seems eminently just. A creditor who occupies the position of director of his debtor is properly barred from using his official power and influence to prefer himself to other creditors, but he should not thereby be compelled to forego the rights which he would have if he occupied the status of creditor alone. In bringing an adversary action against the corporation, and in availing himself of the right of any creditor to levy an attachment, he is not in any way taking advantage of his

position as director.   The rights sought and asserted by him
are entirely independent of his fiduciary status.   It must,
therefore, be held that the attachment lien is not open to at-
tack upon the ground that it was levied by a creditor hold-
ing a position of control over the corporation, if such position
did not affect the prosecution or the defense of the action.
There is no finding that the dominion of the Southern Pacific
Company entered in any way into the attachment suit.   If
we were to go beyond the findings, it would be seen from the
record that the suit brought by the Southern Pacific Company
against the California Development Company was in fact, as
well as in form, an adversary proceeding.   A large number
of stockholders of the California Development Company in-
tervened and set up such defenses as the development com-
pany had to the claims sued upon.   The action was contested
on its merits and the defense was in no way directed or con-
trolled by the plaintiff.   The action resulted in a judgment
in favor of the plaintiff, and that judgment, as has been said,
has now become final, and must be taken as a conclusive adju-
dication that the amount recovered was in fact due.

At this point we may say that we do not agree with the
claim of the appellants that the judgment in question binds
the salt company with reference to the validity, both of the
transfer from the development company to the Southern Pa-
cific Company and of the attachment levied by the latter.
The transfer may have been perfectly good as against the
development company and yet void as against its creditors.
The latter could not, by a proceeding to which they were not
parties, be deprived of the right to attack the transfer as
fraudulent.   The right to attack the attachment was like-
wise not impaired by the judgment.   It is true that a subse-
quent lienholder cannot assail an attachment for defects in
procedure with regard to matters that are personal to the
debtor, such as the failure to give a bond, or omissions in the
affidavit required by statute.   (*Fridenberg* v. *Pierson*, 18 Cal.
152, [79 Am. Dec. 162]; *Harvey* v. *Foster*, 64 Cal. 296, [30
Pac. 849]; *Shea* v. *Johnson*, 101 Cal. 457, [35 Pac. 1023].)
In other words, where there is a *bona fide* claim, mere irregu-
larities in the levy of the attachment not objected to by the
defendant cannot be taken advantage of by subsequent lien
claimants.   But this rule does not apply where the attach-
ment lien itself is assailed for actual fraud in its creation,

operating directly upon the rights of the party complaining. Such is the nature of the attack here made by the salt company.

We must, then, inquire whether any of the other grounds upon which the validity of the attachment were assailed are meritorious. The court found, first, that when the attachment was levied the Southern Pacific Company was in the absolute control of the development company and knew said development company to be insolvent and the action was commenced and the attachment levied by the Southern Pacific Company "for the purpose of fraudulently obtaining an advantage to itself in the payment of its claims," and for the further purpose of hindering, delaying, and defrauding other creditors. It further found that the attachment was intended to "bolster up, protect and strengthen" the claim of the Southern Pacific Company under the transfer made by the development company to it. The finding is to some extent a mixture of statements of fact with conclusions of law. In the final analysis the question is whether the intent attributed to the Southern Pacific Company in these findings, assuming them to be supported by the evidence, did, as a matter of law, operate to defeat its rights as an attaching creditor. In other words, has a creditor a right to levy an attachment upon property of his debtor even though he knows his debtor to be insolvent and levies the attachment for the purpose of securing thereby a preference over other creditors? We omit from consideration the portion of the findings declaring the control of the Southern Pacific Company over the development company, for the reason that, as we have just pointed out, the control of the Southern Pacific did not preclude it from asserting such rights as any other creditor could assert through the means of an adversary proceeding against the debtor. A creditor is not precluded from levying an attachment by his knowledge of the fact that the debtor is insolvent, nor is the validity of his attachment affected by his intention to secure a preference for his own debt. Indeed, attachments are generally sought because the creditor fears that the debtor will be unable to pay all claims against him and because he desires to obtain security for his own demand by means of the attachment. The preference thus obtained is one that is contemplated by the law which authorizes the attachment. It is the reward obtained by superior diligence. The attach-

ment law and the rights given under it would be seriously impaired, if not destroyed, by a holding that an attaching creditor may have his lien defeated by proof that he knew the debtor was insolvent and that he levied his attachment for the purpose of securing a lien prior to the claims of less diligent creditors. The fraud which will destroy the right of attachment must be something in the nature of a want of merit in the claim, or of collusion between the attaching creditor and his debtor.

We can give no greater force to the finding that the attachment was intended to strengthen the title claimed under the transfer from the California Development Company to the Southern Pacific Company. If that title was in any way defective because subject to attack for fraud or because given as security merely, the creditor had a right to obtain, by proper legal process, an attachment lien upon whatever interest may have remained in the debtor. There was in this no element of fraud upon other creditors.

The second ground upon which the attachment was declared ineffective was that the affidavit for attachment was false in alleging that the attachment was not sought nor the action instituted for the purpose of hindering, defrauding or delaying any creditor of the California Development Company, and further in alleging that the claim of the Southern Pacific Company sued on was unsecured. Unless there was, in the beginning of the suit, or the obtaining of the attachment, a fraudulent invasion of the salt company's rights, the first part of this finding must, under the authority of cases like *Shea* v. *Johnson,* 101 Cal. 457, [35 Pac. 1023], be regarded as immaterial. We have already stated our reasons for concluding that no fraud of which the salt company could complain was inherent in the institution of the action or in the levy of the attachment. The finding that the affidavit falsely stated that the claim sued on was unsecured is also immaterial. Under the statute (Code Civ. Proc., sec. 537), the limitation of the right of attachment to actions upon unsecured contracts applies only where the defendants reside in this state. There is no finding that the affidavit did not show that the California Development Company was a nonresident. In fact, it did so allege. This being so, the affidavit was a sufficient foundation for the attachment, regardless of the allegation regarding security, and this allegation

may be ignored as surplusage. It may be added that the evidence shows that the California Development Company was a nonresident of the state. It was organized under the laws of the state of New Jersey, and must therefore be regarded as a nonresident within the meaning of the attach-. ment law. (*Barbour* v. *Paige Hotel Co.,* 2 App. D. C. 174; *Voss* v. *Marble Co.,* 101 Ill. App. 373; *Albright* v. *United Clay Production Co.,* 5 Penne. (Del.) 198, [62 Atl. 726]; *Cowardin* v. *Univ. L. D. Co.,* 32 Gratt. (Va.) 445.)

The third ground upon which, as held by the court below, the Southern Pacific Company was precluded from relying on its attachment was that it had not asserted its right under such attachment until July 17, 1911, something over two years after the levy of the attachment. The court finds that this delay was unreasonable, and that "it would be against equity and good conscience" to permit the Southern Pacific Company to derive any advantage from said attachment against creditors of the California Development Company. We think the latter part of this finding is a conclusion of law, rather than a statement of fact, and that, as such, it does not follow from the facts found. It does not appear in the record, nor is there any suggestion in the briefs, that the delay of the Southern Pacific Company in setting up its claim under the attachment operated in any way to prejudice the rights of the New Liverpool Salt Company or to affect it in any way. "In order to bar a remedy because of laches, there must appear, in addition to mere lapse of time, some circumstances from which the defendant or some other person may be prejudiced, or there must be such lapse of time that it may be reasonably supposed that such prejudice will occur if the remedy is allowed." (*Cahill* v. *Superior Court,* 145 Cal. 42, p. 47, [78 Pac. 467]; *Meigs* v. *Pinkham,* 159 Cal. 104, 111, [112 Pac. 883].) Nothing of the kind appears here. The salt company was in as good a position to question the validity of the attachment when it was asserted, as it would have been if the Southern Pacific Company had, in the early stages of the litigation, filed a pleading alleging that it had an attachment lien. We see no ground for holding that the delay made it inequitable for the Southern Pacific Company to assert its rights under the attachment lien. On the contrary, it seems to us that it would be highly inequitable to

deny it its legal rights merely because of such delay, where the delay did not prejudice any other party.

The result of all this is that on the facts found the trial court should have concluded that the Southern Pacific Company was entitled to priority with regard to the 11,995 shares of stock attached in the action brought by it. The attachment lien does not extend to any property other than these shares of stock. The findings, which are not assailed in this particular, declare in effect that no property other than the 11,995 shares was attached. The salt company, however, did acquire a lien, by creditor's bill, on all of the personal property of the California Development Company in the state of California (other than the 11,995 shares) as well as on the real property in this state, and this lien is prior to any valid claim of the Southern Pacific Company.

The error with respect to the relative priorities of the Southern Pacific Company and the salt company may be corrected by directing the entry of a different judgment upon the findings already made. There is no occasion to direct a new trial.

The fact that neither the Southern Pacific Company nor the salt company has a prior lien upon all of the property to be sold cannot impair the right of bondholders, whose claim is superior to that of both of these parties, to have the property sold as a whole. The rights of the Southern Pacific Company and of the salt company cannot, however, be preserved without an apportionment, on some equitable basis, of the purchase price resulting from such sale, so that each of these parties may receive priority with regard to the proceeds of that portion of the property on which it has a superior lien. The only manner that has been suggested or which suggests itself to us for the accomplishment of this purpose is to direct a sale of the property as a whole as heretofore ordered, and to have, under the direction of the court below, an appraisement of the proportionate values of the 11,995 shares of stock of the Mexican company and of the remaining properties covered by the decree of sale to the end that the surplus proceeds, after paying the prior claims of the bondholders and others, may be apportioned between the salt company and the Southern Pacific Company in proportion to the value of the parts of the entire property upon which they are respectively entitled to priority.

A few words should be said with reference to further points urged by the appellants. It is argued that if the Southern Pacific Company was, as held by the court, a trustee for the California Development Company and its creditors, it was entitled to a prior lien for advances made by it and devoted to the preservation of the trust property. This contention is completely answered by section 2275 of the Civil Code which reads: "An involuntary trustee, who becomes such through his own fault, has none of the rights mentioned in this article." One of the rights mentioned in the article is that of a trustee to reimbursement for expenses actually and properly incurred by him in the performance of his trust. (Civ. Code, sec. 2273.)

We see no force in the claim that the decree violates provisions of the federal constitution, and think the arguments made in this regard do not require specific attention.

It is argued that the court erred in admitting in evidence certain letters written by and to officials and employees of the Southern Pacific Company. While some of these communications were originally privileged, there was evidence justifying the court in concluding, in each case, that the privilege had been waived by voluntarily giving the letter into the hands of third persons. In the other instances of which complaint is made, the letters were written by the general counsel of the Southern Pacific Company to the attorney for the receiver who, as he testified, was not acting for the Southern Pacific Company. The claim of privilege could not apply to these letters.

It was not error to reject evidence that the claims sued upon in the Mexican courts were meritorious, since, as we have already pointed out, the propriety of these judgments was open to inquiry regardless of the merit or want of merit in the claims.

The decree is modified by striking from paragraph 22 thereof, containing the description of the property to be sold, subdivision 7, and substituting therefor the following:

"7. All dredges, automobiles, and other property, either real or personal, owned by said California Development Company and in possession and control of the receiver W. H. Holabird, which has been used in the maintenance, operation, repair or extension of said irrigation system;

"Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining; and all water, water rights, easements, rights of way, maps, surveys, contracts or concessions, necessary for the maintenance or operation of said irrigation system or used in connection therewith; also all rights, claims, causes of action held or claimed by said receiver as such receiver against any person whatsoever"; all of the judgment affecting the rights of the plaintiff and the intervener, as so modified, is affirmed.

So much of paragraph 6 of the decree as directs the order of payment of claims of the New Liverpool Salt Company and the Southern Pacific Company is reversed; the cause is remanded to the court below with directions to enter its conclusions of law and make its decree with reference to the rights of the Southern Pacific Company under its attachment in accordance with the views herein expressed; that is to say, it shall provide for a valuation of all the property directed by it to be sold, showing separately, first, the value of the said 11,995 shares of stock of the Mexican company; second, the value of all the other property to be sold. In fixing the value of the shares of stock of the Mexican company, that corporation shall be treated as the owner of the properties owned by it or standing in its name prior to the proceedings which resulted in the sale to the New Mexican company. The balance of the purchase price remaining after paying the claims prior to those of the New Liverpool Salt Company and the Southern Pacific Company shall by said decree be directed to be paid to said two last named companies, respectively, upon their respective claims, so as to give to the Southern Pacific Company the proportion thereof which the value of said 11,995 shares of stock bears to the value of the entire property, and so as to give to the New Liverpool Salt Company the proportion thereof which the value of the property other than said 11,995 shares bears to the value of the entire property, in each case to the extent only necessary to satisfy the respective claim, if the fund applicable thereto is sufficient therefor.

Any surplus remaining after paying either of said parties in full out of the proportion of the fund primarily applicable to its claim shall be paid to the other to the extent necessary

to satisfy the balance of the claim of such other remaining unpaid. In all other respects the judgment is affirmed.

The orders appealed from are affirmed.

The plaintiff and the intervener shall recover their costs of appeal. The appellants and the New Liverpool Salt Company shall not recover costs.

Shaw, J., Lorigan, J., Melvin, J., and Angellotti, C. J., concurred.

Rehearing denied.

In response to an application of the plaintiff for more specific instructions regarding the carrying into effect of the modified decree, the court in Bank, on November 8, 1915, rendered the following opinion:

SLOSS, J.—The plaintiff asks this court to give to the trial court "more specific instructions" regarding the carrying into effect of the modified decree heretofore directed by us to be entered. The request goes to two points.

1. It is urged that the right of the bondholders to a sale of the entire property is not dependent upon the determination of the extent of the relative rights of the New Liverpool Salt Company and the Southern Pacific Company, and that the court below should, therefore, be directed to proceed at once with the sale without awaiting the appraisement of the property. In the judgment rendered by us, we designedly omitted to prescribe the time of sale. Whether the sale should precede or follow the determination of the values of the parts of the property in which the New Liverpool Salt Company and the Southern Pacific Company are, respectively, entitled to priority is a question to be answered in the first instance by the trial court. That court should determine this question in the exercise of a sound discretion, upon a consideration of all the equities involved, after hearing the various parties in interest.

2. The plaintiff also asks for an addition or modification designed to guard against the possibility that the Southern Pacific Company may be given some measure of priority over holders of bonds. We see no occasion for any such modification of the judgment rendered. That the rights of the hold-

ers of bonds are superior to those of the Southern Pacific Company in and to every part of the property is plainly declared in the parts of the decree which are affirmed, and there is nothing to affect this position in the modification ordered. Our judgment does not undertake to set out the exact form of the modified decree to be entered by the court below, but leaves it to that court to frame the decree in such form as will preserve the relative rights of all of the parties, as declared by those portions of the decree which are affirmed, and by our opinion and judgment.

The application is denied.

Shaw, J., Lawlor, J., and Angellotti, C. J., concurred.